FILED
11/25/2024 9:03 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L013304
Calendar, D
30361024

FILED DATE: 11/25/2024 9:03 PM    2024L013304

Firm I.D. #02329     KTL\tlb     11/21/2024                    2021S-2056

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

MARY KLEBBA-SHULGA, Personal Representative of the
Estate of RONALD SHULGA, Deceased,

    Plaintiff,

        v.

3M COMPANY (f/k/a MINNESOTA MINING AND
MANUFACTURING CO.);
TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE
ANSUL COMPANY;
AGC CHEMICALS AMERICAS, INC.;
AMEREX CORPORATION;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BUCKEYE FIRE EQUIPMENT CO.;
CARRIER GLOBAL CORPORATION;
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS & COMPANY, individually and
as successor-in-interest to DUPONT CHEMICAL SOLUTIONS
ENTERPRISE;
FIRE-DEX, LLC;
FIRE SERVICE PLUS, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC.;
LION APPAREL INC.;
LION GROUP, INC.;
GLOBE MANUFACTURING COMPANY LLC;
MINE SAFETY APPLIANCE COMPANY LLC;
NATIONAL FOAM, INC.;
PBI PERFORMANCE PRODUCTS, INC.;
PERIMETER SOLUTIONS, LP;
STEDFAST USA, INC.;
TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN
MILLS INC.;
W.L. GORE & ASSOCIATES, INC.;
KIDDE FIRE FIGHTING INC., (f/k/a CHUBB NATIONAL
FOAM, INC., f/k/a NATIONAL FOAM, INC.);
KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a
WILLIAMS HOLDINGS, INC.), individually and as successor-
in-interest to NATIONAL FOAM, INC.;
KFI WIND-DOWN CORP., (f/k/a KIDDE-FENWAL, INC.,
f/k/a FENWAL INC.), individually and as successor-in-interest
to NATIONAL FOAM, INC.;

No. **2024L013304**

**Plaintiff Demands Trial By
Jury**

FILED DATE: 11/25/2024 9:03 PM    2024L013304

UTC FIRE & SECURITY AMERICAS CORPORATION, INC.,
(f/k/a GE INTERLOGIX, INC., and successor-in-interest to
NATIONAL FOAM, INC.) Individually and d/b/a CARRIER
FIRE & SECURITY AMERICAS CORPORATION;
THE CHEMOURS COMPANY, individually and as successor-
in-interest to DUPONT CHEMICAL SOLUTIONS
ENTERPRISES;
THE CHEMOURS COMPANY FC, LLC, individually and as
successor-in-interest to DUPONT CHEMICAL SOLUTIONS
ENTERPRISE;
CHEMGUARD, INC.;
ALLSTAR FIRE EQUIPMENT CO.;
CB GARMENT, INC., d/b/a  CREWBOSS;
CHEMDESIGN PRODUCTS INC.;
CHEMICALS, INC.;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
GLOBE HOLDING COMPANY, LLC;
INNOTEX CORPORATION;
LAKELAND INDUSTRIES, INC.;
L.N. CURTIS & SONS;
MALLORY SAFETY AND SUPPLY, LLC;
MILLIKEN & COMPANY;
MSA SAFETY SALES, LLC;
MSA SAFETY INCORPORATED;
MUNICIPAL EMERGENCY SERVICES, INC.;
NARCOTE, LLC (f/k/a STEDFAST INC., and/or  STEDFAST
USA, INC.);
NARCOTE HOLDING CORPORATION (f/k/a STEDFAST
INC., and/or STEDFAST USA, INC.);
NATION FORD CHEMICAL COMPANY;
RICOCHET MANUFACTURING CO., INC.;
SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.;
RTX CORPORATION, as successor-in-interest to UNITED
TECHNOLOGIES CORPORATION, a/k/a RAYTHEON
TECHNOLOGIES CORPORATION;
VERIDIAN LIMITED d/b/a VERIDIAN FIRE PROTECTIVE
GEAR;
and
WITMER PUBLIC SAFETY GROUP, INC. d/b/a "THE FIRE
STORE",

    Defendants.

## **COMPLAINT AT LAW**

2

FILED DATE: 11/25/2024 9:03 PM    2024L013304

Plaintiff, MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, by and through her attorneys, CORBOY & DEMETRIO, P.C., complaining of Defendants, 3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING, CO.); TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC.; ARKEMA, INC.; BUCKEYE FIRE EQUIPMENT CO.; CARRIER GLOBAL CORPORATION; DYNAX CORPORATION; E.I. DU PONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC.;LION APPAREL INC.; LION GROUP, INC.; GLOBE MANUFACTURING COMPANY LLC; MINE SAFETY APPLIANCE COMPANY LLC; NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC.; PERIMETER SOLUTIONS, LP; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN MILLS INC.; W.L. GORE & ASSOCIATES, INC.; KIDDE FIRE FIGHTING INC., (f/k/a CHUBB NATIONAL FOAM, INC., f/k/a NATIONAL FOAM, INC.); KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; KFI WIND-DOWN CORP., (f/k/a KIDDE-FENWAL, INC., f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.;UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC., and successor-in-interest to NATIONAL FOAM, INC.), individually and d/b/a CARRIER FIRE & SECURITY AMERICAS CORPORATION;THE CHEMOURS COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; THE CHEMOURS COMPANY FC, LLC, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; CHEMGUARD, INC.; ALLSTAR FIRE EQUIPMENT CO.; CB GARMENT, INC., d/b/a  CREWBOSS; CHEMDESIGN PRODUCTS INC.; CHEMICALS, INC.; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; GLOBE HOLDING COMPANY, LLC; INNOTEX CORPORATION; LAKELAND INDUSTRIES, INC.; L.N. CURTIS & SONS;

FILED DATE: 11/25/2024 9:03 PM    2024L013304

MALLORY SAFETY AND SUPPLY, LLC; MILLIKEN & COMPANY; MSA SAFETY
SALES, LLC; MSA SAFETY INCORPORATED; MUNICIPAL EMERGENCY SERVICES,
INC.; NARCOTE, LLC (f/k/a STEDFAST INC., and/or STEDFAST USA, INC.);
NARCOTE HOLDING CORPORATION (f/k/a STEDFAST INC., and/or STEDFAST USA,
INC.); NATION FORD CHEMICAL COMPANY; RICOCHET MANUFACTURING CO.,
INC.; SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.; RTX CORPORATION, as
successor-in-interest to UNITED TECHNOLOGIES CORPORATION, a/k/a RAYTHEON
TECHNOLOGIES CORPORATION;VERIDIAN LIMITED d/b/a VERIDIAN FIRE
PROTECTIVE GEAR; and WITMER PUBLIC SAFETY GROUP, INC. d/b/a "THE FIRE
STORE", and each of them, states:

## INTRODUCTION

1.      Plaintiff brings this action for monetary damages for harm to Plaintiff's Decedent
resulting from exposure to per- and polyfluoroalky1 substances ("PFAS") manufactured,
designed, sold, supplied, distributed, and/or contained in products manufactured, designed, sold,
supplied, and/or distributed by each of the Defendants, individually or through their
predecessors, subsidiaries, and/or successors-in-interest.

2.      PFAS are human-made chemicals consisting of a chain of carbon and fluorine
atoms used in manufactured products to, inter alia, resist and repel oil, stains, heat and water.
PFAS include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS")
as well as "short chain" PFAS made up of six or fewer carbon atoms ("short chain PFAS").

3.      PFAS are known as "forever chemicals" because they are immune to degradation,
bio-accumulate in individual organisms and humans, and increase in concentration up the food
chain.  PFAS exposure to humans can occur through inhalation, ingestion and/or dermal contact.

4.      PFAS have been associated with multiple and serious adverse health effects in
humans including cancers, tumors, liver damage, immune system and endocrine disorders, high

cholesterol, thyroid diseases, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.

5.     Unbeknownst to Plaintiff and Plaintiff's Decedent, Defendants manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts") and in Class B firefighting foam ("Class B foam"). Class B foams are synthetic "soap-like" foams capable of spreading rapidly across the surface of a fuel or chemical fire to stop the formation of flammable vapors. Aqueous film-forming foam ("AFFF") is the most commonly used Class B foam.

6.     For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. However, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS and PFAS chemical feedstock, as well as PFAS-containing turnouts and Class B foam, to firefighting training facilities and fire departments nationally, including in Illinois. Defendants did so without ever informing firefighters or the public that these turnouts and Class B foams contained PFAS and without warning firefighters or the public of the substantial and serious health risks and injuries that exposure to PFAS or PFAS-containing materials could cause.

7.     Plaintiff's Decedent wore turnouts and used and was exposed to Class B foam in the usual and normal course of performing his firefighting duties in Illinois and was repeatedly exposed to PFAS in his workplaces for decades.

8.     At all relevant times and continuing to the present, Defendants have represented that their turnouts and Class B foam are safe.

9.     Plaintiff discovered a connection between these products and Plaintiff's Decedent's cancer less than two years before filing this Complaint at Law.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

10.     Plaintiff's Decedent used turnouts and Class B foam as they were intended and in a foreseeable manner, which exposed him to PFAS in the course of his firefighting activities. Plaintiff's Decedent developed and was diagnosed with cancer(s) because of this repeated and extensive exposure.

11.     Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of Illinois when they knew, or reasonably should have known, that Plaintiff's Decedent would repeatedly inhale, ingest and/or have dermal contact with these harmful compounds during firefighting training exercises and in firefighting emergencies, and such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

12.     Plaintiff bring this action against Defendants and seeks money damages.

## PARTIES TO THE ACTION

### A.     Defendants

13.     Defendant, 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Company) ("3M"), is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133. Beginning before 1970 and until at least 2002, 3M developed, manufactured, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in the State of Illinois.

14.     Defendant, TYCO FIRE PRODUCTS, L.P. ("Tyco"), is a limited partnership formed in the State of Delaware with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International PLC, an Irish public limited company listed on the New York Stock

FILED DATE: 11/25/2024 9:03 PM    2024L013304

Exchange [NYSE: JCI]. Upon information and belief, Tyco's partners are Central Sprinkler LLC and Fire Products Holding LLC, whose members are wholly owned by Tyco Fire & Security (US) Management, Inc., which is incorporated in Nevada and its principal place of business is in New Jersey. Accordingly, Tyco is a citizen of Nevada and New Jersey. Tyco is a successor-in-interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990. ("Tyco/Ansul"). Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF containing PFAS. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute, and sell PFAS and PFAS-containing materials, including in Illinois.

15.    Defendant, AGC CHEMICALS AMERICAS, INC. ("AGC"), is a Delaware corporation doing business throughout the United States.  AGC has its principal place of business in Exton, Pennsylvania.  AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

16.    Defendant, AMEREX CORPORATION, also known as Alabama Amerex Corporation, ("Amerex") is an Alabama corporation doing business throughout the United States.  Amerex has its principal place of business in Trussville, Alabama.  Amerex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

17.    Defendant, ARCHROMA U.S., INC. ("Archroma"), is a North Carolina corporation doing business throughout the United States.  Archroma has its principal place of business in Charlotte, North Carolina.  Archroma developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

18.     Defendant, ARKEMA, INC. ("Arkema"), is a Pennsylvania corporation doing business throughout the United States.  Arkema has its principal place of business in King of Prussia, Pennsylvania.  Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

19.     Defendant, BUCKEYE FIRE EQUIPMENT ("Buckeye"), is a North Carolina corporation doing business throughout the United States. Buckeye has its principal place of business in Kings Mountain, North Carolina.  Buckeye developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B Foams, including in Illinois.

20.     Defendant, CARRIER GLOBAL CORPORATION ("Carrier"), is a Delaware corporation doing business throughout the United States.  Carrier has its principal place of business in Palm Beach Gardens, Florida.  Carrier developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

21.     Defendant, DYNAX CORPORATION ("Dynax"), is a New York corporation doing business throughout the United States. Dynax has its principal place of business in Pound Ridge, New York.  Dynax developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

22.     Defendant, E.I. DU PONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprises ("DuPont"), is a Delaware corporation having a principal place of business at 974 Centre Road, Wilmington, Delaware

8

FILED DATE: 11/25/2024 9:03 PM    2024L013304

19805. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

23.     Defendant, FIRE-DEX, LLC ("Fire-Dex"), is a Delaware corporation doing business throughout the United States. Fire-Dex has its principal place of business in Medina, Ohio.  Fire-Dex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

24.     Defendant, FIRE SERVICE PLUS, INC. ("Fire Service Plus"), is a Georgia corporation doing business throughout the United States. Fire Service Plus has its principal place of business in Simi Valley, California.  Fire Service Plus developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

25.     Defendant, HONEYWELL SAFETY PRODUCTS USA, INC. ("Honeywell"), is a Delaware corporation doing business throughout the United States. Honeywell has its principal place of business in Charlotte, North Carolina.  Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

26.     Defendant, JOHNSON CONTROLS, INC. ("Johnson Controls"), is a Delaware corporation doing business throughout the United States. Johnson Controls has its principal place of business in Milwaukee, Wisconsin.  Johnson Controls is the parent of Defendants Tyco Fire Products, LP and Chemguard, Inc. Johnson Controls developed, manufactured, marketed,

FILED DATE: 11/25/2024 9:03 PM    2024L013304

distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

27.     Defendants, LION APPAREL, INC. and LION GROUP, INC. (collectively "Lion"), are Ohio corporations doing business throughout the United States. Lion has its principal place of business in Dayton, Ohio.  Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

28.     Defendant, GLOBE MANUFACTURING COMPANY, LLC ("Globe"), is a New Hampshire corporation doing business throughout the United States. Globe has its principal place of business in Pittsfield, New Hampshire.  Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.  Defendant Mine Safety Appliance Company acquired Globe Holding Company, LLC and its subsidiaries (collectively "MSA/Globe") in 2017 and continues to do business under the Globe name.

29.     Defendant, MINE SAFETY APPLIANCE COMPANY, LLC ("MSA/Globe"), is a Pennsylvania corporation doing business throughout the United States. MSA has its principal place of business in Cranberry Township, Pennsylvania.  MSA acquired Globe Holding Company, LLC, and its subsidiaries (collectively "MSA/Globe") in 2017 and continues to do business under the Globe name.  MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

30.     Defendant, NATIONAL FOAM, INC. ("National Foam"), is a Pennsylvania corporation doing business throughout the United States. National Foam has its principal place of

FILED DATE: 11/25/2024 9:03 PM    2024L013304

business in West Chester, Pennsylvania.  National Foam developed, manufactured, marketed, distributed, released, sold, and/or used PFAS,  PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

31.  Defendant, PBI PERFORMANCE PRODUCTS, INC. ("PBI"), is a Delaware corporation doing business throughout the United States. PBI has its principal place of business in Charlotte, North Carolina.  PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

32.  Defendant, PERIMETER SOLUTIONS, LP ("Perimeter Solutions"), is a Delaware corporation doing business throughout the United States. Perimeter Solutions has its principal place of business in Rancho Cucamonga, California.  Perimeter Solutions developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

33.  Defendant, STEDFAST USA, INC. ("StedFast"), is a Delaware corporation doing business throughout the United States. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

34.  Defendant, TENCATE PROTECTIVE FABRICS USA, d/b/a SOUTHERN MILLS, INC. ("TenCate"), is a Georgia corporation doing business throughout the United States. TenCate has its principal place of business in Senoia, Georgia.  TenCate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

FILED DATE: 11/25/2024 9:03 PM   2024L013304

35.     Defendant, W. L. GORE & ASSOCIATES, INC. ("Gore"), is a Delaware corporation doing business throughout the United States. Gore has its principal place of business in Newark, Delaware.  Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

36.     Defendant, NATIONAL FOAM, INC. ("National Foam"), is a Delaware corporation with its principal place of business and corporate headquarters in Angier, North Carolina. National Foam designed, manufactured, developed, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, throughout the United States.

37.     Defendant, KIDDE FIRE FIGHTING INC. (f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc.), is a North Carolina corporation having a principal place of business in Raleigh, North Carolina. Kidde Fire Fighting, Inc. designed, manufactured, developed, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, throughout the United States. Kidde Fire Fighting, Inc. is sued individually and as successor-in-interest to National Foam, Inc.

38.     Defendant, KIDDE PLC, Inc. (f/k/a Williams US Inc., f/k/a Williams Holdings, Inc.), individually and as successor-in-interest to National Foam, Inc., is a Connecticut corporation with its principal place of business in Farmington, Connecticut. Kidde PLC, Inc., designed, manufactured, developed, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, throughout the United States. Kidde PLC, Inc. is sued individually and as successor-in-interest to National Foam, Inc.

FILED DATE: 11/25/2024 9:03 PM   2024L013304

39.     Defendant, KFI WIND-DOWN CORP., (f/k/a KIDDE-FENWAL, INC., f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC., is a Massachusetts corporation with its principal place of business in Ashland, Massachusetts.  KFI Wind-Down Corp., designed, manufactured, developed, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, throughout the United States.  KFI Wind-Down Corp., is sued individually and as successor-in-interest to National Foam, Inc.

40.     Defendant, UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC., and successor-in-interest to NATIONAL FOAM, INC.), individually and d/b/a CARRIER FIRE & SECURITY AMERICAS CORPORATION, is a corporation organized and existing under the laws of the State of Delaware, doing business in the states of Florida and North Carolina.  UTC Fire & Security Americas Corporation, Inc. designed, manufactured, developed, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, throughout the United States. According to information and belief, KFI Wind-Down Corp. is part of the UTC Climate Control & Security unit of United Technologies Corporation.  UTC Fire & Security Americas Corporation, Inc. is sued individually and as successor-in-interest to National Foam, Inc.

41.     Defendants, National Foam, Inc.; Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc., individually and as successor in interest to National Foam, Inc.; Kidde PLC, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc., individually and as successor in interest to National Foam, Inc.; KFI Wind-Down Corp., individually and as successor in interest to National Foam, Inc.; UTC Fire & Security Americas Corporation, Inc.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

(f/k/a Ge Interlogix, Inc., and Successor-In-Interest to National Foam, Inc.), individually and d/b/a Carrier Fire & Security Americas Corporation, shall collectively be referred to herein as "National Foam."

42. Defendant, THE CHEMOURS COMPANY, individually, and as successor-in-interest to DuPont Chemical Solutions Enterprises, is a Delaware corporation with its principal place of business in Wilmington, Delaware. The Chemours Company designed, manufactured, developed, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, throughout the United States. The Chemours Company is sued individually and as successor-in-interest to DuPont Chemical Solutions Enterprises.

43. Defendant, THE CHEMOURS COMPANY FC, LLC, individually, and as successor-in-interest to DuPont Chemical Solutions Enterprises, is a Delaware corporation with its principal place of business in Wilmington, Delaware. The Chemours Company FC, LLC designed, manufactured, developed, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, throughout the United States. The Chemours Company FC, LLC is sued individually and as successor-in-interest to DuPont Chemical Solutions.

44. Defendant, CHEMGUARD, INC. ("Chemguard"), is a Wisconsin corporation doing business throughout the United States. Chemguard developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

45. Defendant, ALLSTAR FIRE EQUIPMENT CO. ("Allstar"), is a California corporation doing business throughout the United States. Allstar has its principal place of

14

FILED DATE: 11/25/2024 9:03 PM    2024L013304

business in Arcadia, California. Allstar developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

46.     Defendant, CB GARMENT, INC., d/b/a CREWBOSS ("CB Garment"), is an Oregon corporation doing business throughout the United States. CB Garment has its principal place of business in Eugene, Oregon. CB Garment developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

47.     Defendant, CHEMDESIGN PRODUCTS, INC. ("ChemDesign"), is a Delaware corporation doing business throughout the United States. ChemDesign has its principal place of business in Wisconsin. ChemDesign developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

48.     Defendant, CHEMICALS, INC. ("Chemicals"), is a Texas corporation doing business throughout the United States.  Chemicals has its principal place of business in Baytown, Texas. Chemicals developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

49.     Defendant, CLARIANT CORPORATION ("Clariant"), is a New York corporation doing business throughout the United States. Clariant has its principal place of business in North Carolina. Clariant developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

50.     Defendant, CORTEVA, INC. ("Corteva"), is a Delaware corporation doing business throughout the United States. Corteva has its principal place of business in Indianapolis, Indiana. Corteva developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

51.     Defendant, DAIKIN AMERICA, INC. ("Daikin"), is a Delaware corporation doing business throughout the United States. Daikin has its principal place of business in Orangeburg, New York. Daikin developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

52.     Defendant, DEEPWATER CHEMICALS, INC. ("Deepwater"), is a Delaware corporation doing business throughout the United States. Deepwater has its principal place of business in Woodward, Oklahoma. Deepwater developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

53.     Defendant, GLOBE HOLDING COMPANY, LLC ("Globe Holding"), is a New Hampshire corporation doing business throughout the United States. Globe Holding has its principal place of business in New Hampshire. Globe Holding developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

54.     Defendant, INNOTEX CORPORATION ("Innotex"), is a Delaware corporation doing business throughout the United States. Innotex has its principal place of business in Quebec, Canada. Innotex developed, manufactured, marketed, distributed, released, sold, and/or

16

used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

55.     Defendant, LAKELAND INDUSTRIES, INC. ("Lakeland"), is a Delaware corporation doing business throughout the United States. Lakeland has its principal place of business in Huntsville, Alabama. Lakeland developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

56.     Defendant, L.N. CURTIS & SONS ("L.N. Curtis"), is a California corporation doing business throughout the United States. L.N. Curtis has its principal place of business in Walnut Creek, California. L.N. Curtis developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

57.     Defendant, MALLORY SAFETY AND SUPPLY, LLC ("Mallory"), is a Washington corporation doing business throughout the United States. Mallory has its principal place of business in Longview, Washington. Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

58.     Defendant, MILLIKEN & COMPANY ("Milliken"), is a Delaware corporation doing business throughout the United States. Milliken has its principal place of business in Spartanburg, South Carolina. Milliken developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

FILED DATE: 11/25/2024 9:03 PM   2024L013304

59.     Defendant, MSA SAFETY SALES, LLC (" MSA Safety"), is a Pennsylvania corporation doing business throughout the United States. MSA Safety has its principal place of business in Cranberry Township, Pennsylvania. MSA Safety developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

60.     Defendant, MSA SAFETY INCORPORATED ("MSA Safety Incorporated"), is a Pennsylvania corporation doing business throughout the United States. MSA Safety Incorporation has its principal place of business in Cranberry Township, Pennsylvania. MSA Safety Incorporation developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

61.     Defendant, MUNICIPAL EMERGENCY SERVICES, INC. ("Municipal Emergency Services"), is a Nevada corporation doing business throughout the United States. Municipal Emergency Services has its principal place of business in Connecticut. Municipal Emergency Services developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

62.     Defendant, NARCOTE, LLC ( f/k/a Stedfast, Inc., and/or Stedfast USA, Inc.) ("Narcote LLC"), is a Delaware corporation doing business throughout the United States. Narcote LLC has its principal place of business in Piney Flats, Tennessee. Narcote LLC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

FILED DATE: 11/25/2024 9:03 PM    2024L013304

63.     Defendant, NARCOTE HOLDING CORP. ( f/k/a Stedfast, Inc., and/or Stedfast USA, Inc.) ("Narcote Holding"), is a Delaware corporation doing business throughout the United States. Narcote Holding has its principal place of business in Piney Flats, Tennessee. Narcote Holding developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

64.     Defendant, NATION FORD CHEMICAL COMPANY ("National Ford"), is a South Carolina corporation doing business throughout the United States. National Ford has its principal place of business in Fort Mill, South Carolina. National Ford developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

65.     Defendant, RICOCHET MANUFACTURING CO., INC. ("Ricochet"), is a Pennsylvania corporation doing business throughout the United States. Ricochet has its principal place of business in Philadelphia, Pennsylvania. Ricochet developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

66.     Defendant, SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC. ("SCFT"), is a Delaware corporation doing business throughout the United States. SCFT has its principal place of business in Greenville, South Carolina. SCFT developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

67.     Defendant, RTX CORPORATION, as successor-in-interest to UNITED TECHNOLOGIES CORPORATION, a/k/a RAYTHEON TECHNOLOGIES CORPORATION,

is a Delaware corporation doing business throughout the United States. United Technologies has its principal place of business in Arlington, Virginia. United Technologies developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

68. Defendant, VERIDIAN LIMITED d/b/a VERIDIAN FIRE PROTECTIVE GEAR ("Veridian"), is an Iowa corporation doing business throughout the United States. Veridian has its principal place of business in Spencer, Iowa. Veridian developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

69. Defendant, WITMER PUBLIC SAFETY GROUP, INC., d/b/a "THE FIRE STORE" ("Witmer"), is a Pennsylvania corporation doing business throughout the United States. Witmer has its principal place of business in Coatesville, Pennsylvania. Witmer developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

70. Plaintiff alleges each named Defendant is in some manner responsible for the acts alleged herein and they proximately caused the injuries to Plaintiff's Decedent as alleged herein.

71. Plaintiff alleges each named Defendant derived substantial revenue from the PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, and/or sold within Illinois and used by Plaintiff's Decedent within Illinois.

72. Defendants expected or should have expected their acts to have consequences within the State of Illinois and derived substantial revenue from interstate commerce.

20

FILED DATE: 11/25/2024 9:03 PM    2024L013304

FILED DATE: 11/25/2024 9:03 PM    2024L013304

73.     Defendants purposefully availed themselves of the privilege of conducting business activities within the State of Illinois, thus invoking the benefits and protections of its laws.

### FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

**A.     Plaintiff's Decedent's Use of Exposure to PFAS-Containing Products**

74.     As a first responder to fire, medical, and other emergency calls, Plaintiff's Decedent risked his life on a daily basis. He not only saved lives and property, but also provided emergency services and medical care, performed rescues, and offered support to people in traumatic circumstances. To prepare and protect himself during this enormously challenging work, Plaintiff's Decedent wore turnouts and received training in fire suppression, including but not limited to handling and use of firefighting foam, fire prevention, rescue, and emergency medical care techniques to protect or minimize the loss of life, property, and damage to the environment.

75.     For decades, and all relevant times hereto, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed chemical feedstock and/or turnouts and/or Class B foam containing PFAS to firefighting training facilities and fire departments globally, including within the State of Illinois.

76.     With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms, which are widely used in products to, inter alia, resist and repel oil, heat and water, and have been found to have negative health effects.  These toxic chemicals are present in firefighter turnouts and Class B foam.

**(1)     PFAS-Containing Turnout Gear**

21

FILED DATE: 11/25/2024 9:03 PM    2024L013304

77.     During firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts intended to provide a degree of thermal, chemical, and biological protection for a firefighter.  Turnout gear components include individual components such as a helmet, hood, jacket, pants and suspenders, boots, and gloves.  Each component of the jacket and pants are made of an outer layer, as well as several inner layers which include a moisture barrier and thermal liner meant to protect the firefighters from ambient heat.

78.     PFAS chemicals are used in turnout gear to impart heat, water, and stain resistance to the outer shell and moisture barrier of turnout gear.

79.     Researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA/Globe, Lion and Honeywell, and found high levels of PFAS in turnout gear worn, used, or handled by firefighters, including Plaintiff's Decedent.

80.     When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust, exposing firefighters to PFAS chemicals, particles, and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation.  Further, firefighters' exposure to these highly mobile and toxic materials occur through normal workplace activities because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' personal vehicles and homes.

81.     Unbeknownst to firefighters, workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980 internal memo, DuPont officials described measures needed to prevent workplace exposure to PFAS, which they knew could permeate all protective materials, and noted PFAS' toxicity varied depending on the

exposure pathway, acknowledging ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic," and inhalation was "highly toxic." The memo concluded "continued exposure is not tolerable."

82.     Plaintiff's Decedent wore turnouts in the ordinary course of performing his duties as the turnouts were intended to be used and in a foreseeable manner which exposed him to significant levels of PFAS.

83.     Plaintiff's Decedent did not know, and in the exercise of reasonable diligence could not have known, that the turnouts he wore or used in the course of performing his duties contained PFAS or PFAS-continuing materials, and similarly did not know, and could not have known, he routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts he wore or used in performing his duties. The turnout gear worn or used by Plaintiff's Decedent did not and does not contain labeling information warning that the gear contains PFAS, and similarly did not and does not warn Plaintiff's Decedent of the health risks associated with exposure to PFAS.

84.     Like fire departments across the country, firefighters in Illinois only had one set of turnouts for years and would wash their turnouts at home or in station machines along with their daily station wear uniforms.

### (2)     PFAS-Containing Class B Foam

85.     Class B foam is one of the primary tools used by firefighters for suppression of fires and is particularly effective for extinguishing fires involving oil and/or chemicals common at transportation accidents, aircraft accidents, and chemical spills. Class B foam is also used in structural or other types of non-chemical fires when water cannot penetrate deeply enough to

FILED DATE: 11/25/2024 9:03 PM   2024L013304

ensure an unseen fire is extinguished. The most common Class B foam is aqueous film-forming foam ("AFFF"). AFFF and other Class B foam contain PFAS.

86.     To use Class B foam, a Class B foam concentrate must first be mixed with water.

87.     Class B foam concentrate is typically sold in five-gallon containers that firefighters are responsible for storing on the fire engine and/or pouring into the foam bladder of a fire engine. To mix the foam concentrate and water from a fire engine not pre-plumbed for foam, an educator must be placed in the foam concentrate to draw up the concentrate and mix it with water to create a thick, foamy substance. Firefighters are responsible for this process of preparing the foam, applying the foam and for cleaning the equipment (hoses, nozzles, etc.) after use.

88.     Firefighters who handled the process of preparing Class B foam, applying the foam, and then cleaning the equipment after foam use were exposed to PFAS through skin contact, inhalation, and/or ingestion. The Class B foam containers used by Plaintiff's Decedent and his fire department to mix and prepare the Class B foam for use did not say the foam contains PFAS, nor did it warn Plaintiff's Decedent of the serious health risks associated with exposure to PFAS.

89.     Class B foam is used in fire extinguishment by spraying it through a fire hose, appliance, or nozzle.

90.     The techniques used for "laying a blanket" of Class B foam in fire extinguishment include banking the foam off a wall or vertical surface to agitate the foam before it covers the fire; or applying it to the ground surface where the fire is burning. In structure fires, it can also be necessary to spray the ceilings, walls and floors. Reapplication of foam is often necessary because the foam blanket will break down over a short time.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

FILED DATE: 11/25/2024 9:03 PM    2024L013304

91.     These techniques are used routinely in firefighting training as well as in real-world fire extinguishment, and result in firefighters being sprayed or even soaked with Class B foam, walking in and through Class B foam (which can reach thigh-high or even waist-high), or kneeling in Class B foam during use. As a result, firefighters experienced exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact).

92.     Plaintiff's Decedent used and was exposed to Class B foam in the ordinary course of performing his duties as a firefighter and used these foams for their intended purposes and in foreseeable manners.

93.     Plaintiff's Decedent did not know, and in the exercise of reasonable diligence could not have known, that the Class B foam he used and/or was exposed to in the course of performing his duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known he routinely suffered exposure to PFAS or PFAS-containing materials in the Class B foam he used and/or was exposed to in performing his duties.

**B.     The Chemical Structure of PFAS Makes Them Harmful to Human Health**

94.     PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain.  Indeed, scientists are unable to estimate an environmental half-life (i.e. the time it takes for 50% of the chemical to disappear) for PFAS.  Additionally, some PFAS chemicals (known as "precursors") degrade into different long-chain PFAS chemicals.

95.     PFAS are nearly indestructible and are highly transportable. Humans can be exposed to PFAS through inhalation, ingestion, or dermal contact.

96.     PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and PFHxS. The PFAS chemical

FILED DATE: 11/25/2024 9:03 PM    2024L013304

industry has repeatedly asserted short-chain PFAS are safer and bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are molecularly similar to long-chain PFAS, and recent scientific research conducted in 2020 shows short-chain PFAS are in fact extremely persistent; highly mobile and transportable; almost impossible to remove from water; bio-accumulate in humans and the environment; and show similar toxicity as long-chain PFAS. Short-chain PFAS also have lower technical performance and may therefore be used at higher quantities, cancelling out any supposed benefits of lower bioaccumulation potential.

97.     In October 2021, the U.S. Environmental Protection Agency ("EPA") updated its 2018 assessment of short-chain PFAS, also known as "GenX," finding two of Defendant Chemours GenX chemicals are more toxic than PFOA - the highly toxic chemical these were intended to replace.

98.     To date, there is no safe, acceptable, or "normal" level of PFAS in the human body.  Further, the fact PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health.  Defendants' attempt to obscure the fact there are thousands of PFAS – including precursor PFAS degrading into PFOA and PFOS through their assertions their products are safe because they do not contain PFOA or PFOS, or because they contain short-chain PFAS - just another example of their efforts to deflect from the reality there are thousands of PFAS.

99.     PFAS exposure affects nearly every system in the human body. It has been associated with multiple and serious adverse health effects in humans including, but not limited to, cancers, tumors, liver damage, immune system and endocrine disorders, thyroid diseases, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated

FILED DATE: 11/25/2024 9:03 PM    2024L013304

changes in gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor promotion, and other health conditions.

### C. Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied, and/or Sold Toxic PFAS and/or Products Containing PFAS

100. Defendants have each marketed, developed, distributed, sold, promoted, manufactured, released, or otherwise used PFAS chemicals in products, including in PFAS-containing turnout gear and Class B foam, throughout the United States and in Illinois.

101. PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other companies, including DuPont.

102. By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this, PFAS had never been detected in nor were present in human blood or bodies.

103. In the 1960s, Class B foam containing PFAS entered the global market and became the primary firefighting foam all over the world, with 3M as one of the largest manufacturers.

104. In the 1970s, Defendants National Foam and Tyco began to manufacture, market, and sell Class B foam containing PFAS, followed by Defendants Chemguard and Dynax in the 1990s, and Defendant Buckeye in the 2000s.

105. Defendant MSA/Globe began manufacturing, marketing and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA/Globe (under the Globe name) continues to manufacture, market, and sell turnout gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.

106. Defendant Lion began to manufacture, market and sell turnout gear in 1970. Since its founding, and continuing through to the present, Lion makes, markets and sells turnout

FILED DATE: 11/25/2024 9:03 PM    2024L013304

gear using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by Defendant DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.

107.    Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the protective gear industry and becoming one of the leading manufacturers of turnouts. Honeywell makes, markets, and sells turnout gear using PFAS-containing fabrics supplied by Defendants DuPont, Gore, PBI, and StedFast.

### D.    Defendants Knew Exposure to PFAS Causes Serious Health Impacts

108.    Defendants, including specifically 3M and DuPont, have long known about the serious and significant impacts to health caused by exposure to PFAS, having conducted study after study on the exposure and health effects of PFAS on animals, and in some cases, even on their own employees. The findings of these studies were discussed within the companies internally yet were never made public or shared with any regulatory agencies.

109.    By at least the end of the 1960s, additional research and testing performed by 3M and DuPont Chemical Solutions Enterprise indicated such materials, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

110.    Early studies showed PFAS accumulated in the human body and were "toxic." 3M studies from the 1970s concluded PFAS were "even more toxic" than previously believed.

111.    In 1976, 3M found PFAS was persistent in the blood of its workers. 3M should have been alerted to the same issue raised by findings regarding PFAS in the prior year. 3M communicated its findings to DuPont Chemical Solutions Enterprises, but not to industry regulatory agencies or the public.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

112.    Upon information and belief, by the 1970s, 3M and DuPont Chemical Solutions Enterprise knew their PFAS was widely present in the blood of the general U.S. population and would accumulate and build up in the blood and body of the exposed individuals with each additional exposure. 3M and DuPont Chemical Solutions Enterprise concealed this knowledge from the public and government regulators.

113.    In 1975, 3M concluded PFAS were present in the blood of the general public. Since PFAS are not naturally occurring, this finding should have alerted 3M to the possibility their products were the source of this increase in the presence of PFAS. 3M should have been alerted to the possibility PFAS might be mobile, persistent, bio-accumulative, and biomagnifying, as those characteristics could explain the absorption of PFAS in blood from 3M's products.

114.    In 1976, 3M found PFAS in the blood of its workers. 3M should have been alerted to the same issues raised by findings regarding PFAS in the prior year.

115.    In or about 1977, Tyco/Ansul was also aware of the environmental and toxic concerns of its PFAS-containing products and undertook a study and investigation on more environmentally improved products.

116.    A 1978 study by 3M showed PFAS reduced the survival rate of fathead minnow fish eggs.

117.    Other studies by 3M in 1978 showed PFAS are toxic to rats and monkeys. In one 1978 3M study, all monkeys died within the first few days of being given food contaminated with PFAS.

118.    In 1983, a 3M study found PFAS caused growth of cancerous tumors in rats.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

119.    By at least the end of the 1980s, additional research and testing performed by
Defendants manufacturing and/or using PFAS materials, including at least 3M and DuPont
Chemical Solutions Enterprise, indicated elevated incidence of certain cancers and other adverse
health effects, including elevated liver enzymes and birth defects, had been observed among
workers exposed to such materials, including at least PFOA, but such data was not published,
provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

120.    By at least the 1990s, additional research and testing performed by Defendants
manufacturing and/or using PFAS materials, including at least 3M and DuPont Chemical
Solutions Enterprise, indicated at least one such PFAS material, PFOA, had caused a triad of
tumors (Leydig cell (testicular), liver and pancreatic) in a second chronic cancer study in rats.

121.    By December 2005, the EPA uncovered evidence DuPont concealed the
environmental and health effects of PFOA, and the EPA announced the "Largest Environmental
Administrative Penalty in Agency History." The EPA fined DuPont for violating the Toxic
Substances Control Act "Section 8(e)—the requirement companies report to the EPA.
Substantial risk information about chemicals they manufacture, process, or distribute in
commerce." In the face of and undeterred by the EPA's action, Defendants' turnout
manufacturers, such as MSA (Globe) and Lion, partnered with DuPont and with Defendant Gore
to develop, manufacture, market, distribute and/or sell turnouts made with DuPont's and/or
Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).

122.    All Defendants knew or should have known their PFAS and products containing
PFAS easily dissolve in water, because the products were designed to be mixed with water; are
mobile, because the products were designed to quickly form a thin film; resist degradation,
because it is the nature of the products' chemical composition, and the products had long shelf-

lives; and tend to bioaccumulate, because studies regarding the presence of substances with carbon-fluorine bonds in the blood of the general population were publicly available beginning in at least 1976.

123.    In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies manufacturing, processing or distributing chemicals to immediately report to the EPA information "reasonably supports the conclusion" a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, fire departments, the Plaintiff's Decedent, or the public about the health impacts resulting from exposure to PFAS.  Indeed, in at least some instances, Defendants' own attorneys advised the companies to conceal their damaging findings on PFAS, which they did for decades.

124.    In 2000, 3M announced it would cease manufacturing a specific PFAS chemical, PFOS, as well as Class B foam, on the same day the EPA announced PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." However, 3M did not recall PFOS, its chemical feedstock, or any Class B foam it had previously manufactured, sold, distributed, or was then stored at firehouses and being used by firefighters around the country. Further, no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote, distribute and sell PFAS chemicals and PFAS-containing products, including specifically PFAS-containing turnout, and Class B foams, and did so without any warning to firefighters or to the public concerning the fact these turnouts and foams contained PFAS, or they posed a serious health risk to human health.  Defendants instead continued to claim their products were safe.

31

125.    In 2001, a class-action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

126.    A Science Panel, sometimes referred to as C8, formed out of this class-action settlement. The C8 panel consisted of three epidemiologists specifically tasked with determining if there was a probable link between PFAS exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy-induced hypertension, and hypercholesterolemia.

127.    However, Defendants continued to manufacture, market, promote, distribute, and sell PFAS and PFAS-containing products, including turnouts and Class B foam, and continued to publicly claim these products were safe.  Defendants affirmatively suppressed independent research on PFAS, and instead commissioned dubious research and white papers to support their claims PFAS and PFAS-containing products were safe to use, engaging consultants to further this strategy and ensure they would continue to profit from these toxic chemicals and products.

128.    As one consultant wrote in pitching its services to DuPont, it was critical the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, the plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA."

129.    Class B foam manufacturers and distributors adopted a similarly aggressive industry campaign to evade government oversight or public attention of the risks posed by their products.  At a March 2001 meeting of the National Fire Protection Association's Technical Meeting on Foam, which included Defendant Class B foam manufacturers Tyco, Chemguard, and National Foam, a 3M representative informed attendees 3M had discontinued its Class B

FILED DATE: 11/25/2024 9:03 PM    2024L013304

FILED DATE: 11/25/2024 9:03 PM    2024L013304

foam business, citing concerns about the "proven pervasiveness, persistence and toxicity" of PFOS. Attendees also were informed of evidence telomer-based fluorosurfactants (used by every Class B foam manufacture except 3M) degrade to PFOA and, worse, exhibit an even greater degree of pervasiveness and toxicity than PFOA.

130.    On or about the same time, certain Defendants, including at least Tyco, DuPont, Dynax and Buckeye, founded and/or became members of the Fire Fighting Foam Coalition ("FFFC") – a non-profit organization of manufacturers, distributors and suppliers of Class B foam (specifically AFFF). The FFFC's self-described role was to be "the environmental voice for users and manufacturers of AFFF – one designed to ignore the health impacts of exposure to PFAS- containing Class B foams such as AFFF."

131.    Defendants continued to produce Class B foams containing PFAS and continued to publicly represent PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

132.    In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, and Arkema, to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.

133.    By this time, Defendants had begun to aggressively manufacture, market and/or distribute short-chain PFAS, such as Gen X, claiming these alternative PFAS chemicals did not pose significant health risks to humans or the environment. But, these claims, too, were false. Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood, and at least one of them produces the same types of cancerous tumors in rats as had been found in long-chain PFAS studies.

134.     In 2011, the C8 Panel began releasing more findings. The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS) and found significant negative human health effects (including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

135.     In 2015, DuPont spun-off its PFAS chemicals business, as well as two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."

136.     In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFAS. The NTP concluded both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies, and "high confidence" PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.

137.     The IARC concluded there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."

FILED DATE: 11/25/2024 9:03 PM   2024L013304

FILED DATE: 11/25/2024 9:03 PM    2024L013304

138.    In June 2018, the Agency for Toxic Substances and Disease Registry ("ASTDR"), a division of the Centers for Disease Control and Prevention at the US Department of Health and Human Services, released a 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding PFAS "are potentially more hazardous than previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence – PFAS are extremely slow to biodegrade."

### E.    Defendants Failed to Warn Plaintiff's Decedent of the Dangers of Exposure to PFAS and Falsely Represented Their PFAS Products Were Safe

139.    As alleged above, Defendants knew PFAS are persistent, toxic, and bioaccumulating with a very long half-life. They knew exposure to PFAS can cause serious and life-threatening diseases, including cancer.

140.    Yet Defendants did not warn Plaintiff's Decedent that PFAS and their PFAS-containing products, including turnouts and Class B foams used by firefighters, contained PFAS, or that exposure to PFAS in the normal and intended use of such products could cause serious bodily harm.

141.    Instead, Defendants falsely represented – and continue to falsely represent – that PFAS and PFAS-containing products, including turnouts and Class B foams, are safe and not harmful to humans or the environment.

142.    Such assertions fly in the face of science and a global movement toward eliminating this class of chemicals from consumer products. For example, Congress passed legislation to address PFAS in turnouts and foam and numerous States have severely restricted or banned PFAS-containing firefighting foam. Additionally, California also requires sellers of turnout gear to notify purchasers if it contains PFAS, while Colorado has banned PFAS-containing turnouts as of 2022.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

143.     The US Food and Drug Administration ("FDA") similarly has called for the phasing out of short-chain PFAS-containing 6:2 fluorotelomer alcohol ("6:2 FTOH"). Private companies like Home Depot, Lowes, and Staples recently have begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (Columbia and Marmot), clothing retailers (H&M, Levi Strauss & Co), shoe companies (Adidas and New Balance), car manufacturers (Britax and Graco), furniture companies (IKEA), personal care companies (Johnson & Johnson and Oral-B), and textile manufacturing companies.

**(1)     Defendants Provide No Safety Warnings on Product Labels**

144.     The packaging on the PFAS-containing Class B foam containers used for mixing Class B foam with water, pumping the mixture into engines, and for spraying and laying foam blankets for fire suppression or fire suppressing training, contained no warning the Class B foam contained PFAS. Nor did the packaging inform persons handling or using the foam as it was intended to be handled that such use can result in exposure to PFAS and serious bodily harm.

145.     Further, the turnouts containing PFAS or PFAS materials sold by Defendants in Illinois, and used by Plaintiff's Decedent in training, emergency incidents, or in fire suppression during his firefighting career, also contained no warning that the turnouts contain PFAS or PFAS materials. Nor did these labels inform persons handling, wearing, or using the turnouts as they were intended to be handled, worn, or used that these activities could result in exposure to PFAS and serious bodily harm.

**(2)     Defendants Do Not Warn About PFAS Exposure on Their MSDS Sheets**

146.     A Material Safety Data Sheet ("MSDS") is a document the Occupational Safety and Health Administration ("OSHA") requires companies to provide to end users for products

containing substances or chemicals classified as hazardous or dangerous. Firefighters need access to such information to provide a safe and effective response in emergency situations.

147. Defendants did not – and to this day do not – state their Class B Foams contain PFAS or PFAS-containing materials; PFAS is persistent, toxic, and bio-accumulating; or PFAS exposure causes serious bodily harm on the MSDS they provided. Contrarily, Defendants falsely stated the Class B foams and/or their contents were not known carcinogens and did not cause birth defects on their MSDS.

148. Currently, Defendants still do not state the known serious health risks and hazards associated with exposure to PFAS in these Class B foams on their MSDS. For example, Defendant National Foam stated their Class B foam was not considered carcinogenic – contrary to decades of scientific research – on an updated MSDS.

### (3) Defendants Continue to Misrepresent the Dangers of PFAS

149. Despite their decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, to misrepresent the safety of PFAS, and minimize and fail to warn about the hazards of exposure to PFAS or turnouts and Class B foams made with or containing PFAS.

150. All the Defendants are sophisticated and knowledgeable in the art of science of formulating PFAS and PFAS-containing products. They understood far more about the properties of and the biodegradability of their additives than any customer or consumer. They chose not to use their knowledge to design safer products. Defendant Ansul wrote the following about the biodegradation of PFAS. Biodegradation is a "measure of how completely a substance breaks down in the environment. The biodegradability of a chemical is expressed as a percentage determined by dividing the BOD by the COD and multiplying by 100. The chemical oxygen

FILED DATE: 11/25/2024 9:03 PM   2024L013304

demand, COD, is the amount of oxygen needed to completely break a chemical down to its most oxidized state (for example: $CO_2$, $H_2O$, and HF) and is a measured analytical value. The biochemical oxygen demand, BOD, is an empirical test measuring a relative oxygen requirement. This test measures the oxygen required for the biochemical degradation of organic and inorganic material… For firefighting foams, this test is conducted for 20 days as opposed to the usual five days for other chemicals because the bacteria require a longer time to acclimate to the test solution of the foam… B[b]iodegradation is the percentage ratio of BOD/COD. If the resulting number is higher than 50%, the chemical is determined to be readily biodegradable. If it is below 15%, the chemical is determined to be not biodegradable. Ansul summarized its explanation by noting: If BOD/COD > 50%, then biodegradable; If BOD/COD < 15%, then NOT biodegradable."

151.     The information Ansul published and widely distributed to its customers is both misleading and deceitful. Ansul ignores the fact, while the additives in Class B foams biodegrade, perfluorinated surfactants do not. PFAS when present in the environment does not undergo any further chemical, microbial or photolytic degradation or breakdown. Long before, 3M understood this as shown by its explanation of biodegradability in a 1976 study, noting hydrocarbon components of a perfluorinated admixture will degrade, leaving behind the perfluorinated components which do not biodegrade. Once these substances undergo biotic or abiotic degradation, the perfluorinated moiety remaining will be PFOS. The rate of degradation to PFOS is not considered significant and over time these substances are all expected to degrade in the environment to environmentally persistent PFOS. 3M knew these were facts in the 1960s. The other Defendants knew or should have known these facts; and if they did not, then they

FILED DATE: 11/25/2024 9:03 PM    2024L013304

FILED DATE: 11/25/2024 9:03 PM    2024L013304

simply created their products blindly and without concern as to whether they could cause harm to users.

152.    Defendants have participated in a long-standing misinformation campaign, which persists to this day. Some pertinent examples include:

a.    2017 – Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through turnout gear. Schwartz called this assertion false, stating Lion's turn-out gear is not treated or made with PFOS or PFOA:. "PFOAs and PFOSs have never been components of Lion's turn-out gear, either as a coating or as a textile." He acknowledged turn-out gear is treated with PTFE to provide a durable water repellant, and the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into Lion's turn-out gear. ***However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear.***" (Emphasis added).

b.    2018 – The National Fire Protection Association (which maintains committees on foams and turnouts are comprised, in part, of certain Defendants) issued a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts after exposure to chemicals. There was not a single mention of avoiding contact with foam and/or the risks of wearing turnouts containing PFAS or PFAS-containing materials.

c.    2019 – Defendant Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important firefighters continue to wear and properly care for their gear to stay safe on the job."

d.    2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress she ***absolutely agreed with the statement that "the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure."*** (emphasis added)

e.    2019 - The Fire Fighting Foam Council (of which many Defendants have been members since its inception in 2001) wrote in their newsletter: "Short-chain (C6)

FILED DATE: 11/25/2024 9:03 PM   2024L013304

fluorosurfactants do not contain or breakdown in the environment to PFOS or PFOA and are currently considered lower in toxicity and have significantly reduced bio-accumulative potential than long-chain PFAS."

f.  2019 – Defendant Dynax founder Eduard Kleiner stated C6-based surfactants [short-chain PFAS] do not bioaccumulate.

g.  2019 – Defendant Gore issued a public statement, stating "the potential exposures and associated risks of cancer effects from PFOA alternative and non-polymeric perfluoroalkyl substances in Gore Components [turnout gear] are insignificant."

h.  2020 - Fluoro Council – the lobbying arm of the PFAS industry – maintains PFAS fluorotelomers in Class B foam and turnouts do not cause cancer, disrupt endocrine activity, negatively affect human development or reproductive systems, do not build up in the human body, and do not become concentrated in the bodies of living organisms.

i.  2020 - The Fire Fighting Foam Council website states:  "The short-chain (C6) fluorosurfactants that have been the predominant fluorochemicals used in fluorotelomer-based AFFF for the last 25 years are low in toxicity and not considered to be bio-accumulative based on current regulatory criteria.

j.  2020 - The Fire Fighting Foam Council's Best Practice Guidance for Use of Class B Foam - which was published in May 2016 and has not been updated to reflect the latest research - focuses entirely on eliminating and containing foam to minimize impact on the environment.  It makes no mention of how to minimize the impact on firefighters who routinely handle, prepare, spray, or use Class B foam during training or in firefighting.

k.  2020  – Defendant Lion-hired consultant Paul Chrostowski, PhD, and took out a full-page in Firefighter Nation to argue turnout gear is completely safe and any evidence to the contrary, including the Notre Dame study, is unreliable and fear-mongering. "[E]ven if PFAS were found in their turnout gear, at this time there is no credible evidence that it ends up in firefighters bodies in amounts that would be higher than the general population…. the connection between PFAS and cancer is extremely weak.  The few peer-reviewed epidemiological studies that have found an association were not statistically significant and inconsistent with other studies…. The materials used in turnout gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer causing toxic chemicals present on the fireground, as

FILED DATE: 11/25/2024 9:03 PM   2024L013304

well as metabolic heat stress…Alternative materials tried by the U.S. Fire Service thus far have proven to be unsafe.

l.     2020 – Defendant Lion, through its hired consultant Chrostowski, also stated in Firefighter Nation all turnouts are compliant with the standards set by the NFPA and Swiss organization OEKO-TEX's  Standard 100 for PPE and Materials for PPE. "The OEKO-TEX certification process tests for the presence of unsafe levels of trace materials, including PFOA.

m.     2021 - In a New York Times article, Defendant W.L. Gore maintained its turnout products were safe.

n.     2021 - Defendant Lion stated the representations articulated by its consultant, Paul Chrostowski, in 2020 (see above), reflect its position: "Dr. Chrostowski's report says it all for Lion."

o.     2021 - Defendants MSA Globe and W.L. Gore have continued to state their products have been tested and are safe.

p.     2022 – Defendant 3M stated it was not "necessary or appropriate" to declare any PFAS hazardous.   It also states on its website: "The weight of scientific evidence from decades of research does not show that PFOS or PFOA causes harm in people at current or past levels….Decades of research into the health of these workers has not identified negative health outcomes caused by exposure to PFOA or PFOS….It is important to know that while some studies may find links or associations with possible health outcomes, this is not the same as causation. The weight of scientific evidence does not show that PFOS or PFOA causes harm to people at current or historical levels.  Although PFAS have been detected in the environment at extremely low levels, their mere presence does not mean they are harmful…. Although it has been widely reported that no causal connection has been identified between exposure to PFOS or PFOA and harm to people's health, there is a great deal of misinformation in the public domain…. The findings of the C-8 science panel are also frequently misunderstood.

q.     2022 - DuPont and Chemours also continue to assert there is little scientific evidence to support PFAS and/or certain PFAS, like fluoropolymers, are harmful to human health.

r.     2022 - DuPont maintains turnouts keep firefighters safe and "protect against the intrusion of…chemicals."

41

FILED DATE: 11/25/2024 9:03 PM 2024L013304

153.     As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership has echoed these narratives.

154.     For example, in 2017, the International Association of Fire Fighters ("IAFF"), which represents more than 324,000 full-time professional firefighters, issued a mischaracterized statement and purported to state the risks associated with exposure to PFAS and PFAS chemicals and materials in turnouts and Class B foams was minimal to non-existent. The IAFF even encouraged firefighters to continue to wear turnouts and use legacy Class B foams, creating a false sense these PFAS-containing turnouts and foams were safe.

155.     The IAFF maintained the Defendants' position that turnout gear and Class B foams were safe until new leadership took over in 2021. As such, Plaintiff's Decedent did not know and, in the exercise of reasonable diligence could not have known, that the turnouts and Class B foams he wore and used contained PFAS or PFAS-containing materials, caused him to be exposed to PFAS and/or PFAS-containing materials, and caused him to develop cancer as a result of such exposure because of these and other false claims and misrepresentations on the part of Defendants.

F.     **New Research Indicates Firefighters are at Significant Risk of Harm From Exposure to PFAS in Turnouts and Class B Foams – But Defendants Continue to Discount or Deny These Risks**

156.     While historical research (and follow-on litigation) has centered on environmental impacts and environmental exposures associated with PFAS and PFAS-containing products, recent studies have focused specifically on the serious health impacts to firefighters stemming from their occupational exposure to turnouts and Class B foams containing PFAS.

157.     In October 2019, for example, an expert panel of the International Pollutants Elimination Network ("IPEN"), an international non-profit organization comprised of over 600

public interest non-governmental organizations dedicated to improving global chemical waste policies, published a scientific paper, in the words of its authors, "presents unequivocal evidence from recent studies that firefighters" using Class B foams (primarily AFFF) "have unexpectedly elevated blood levels" of PFAS, including, specifically, PFHxS and PFOS, with PFHxS (a short-chain, C6 PFAS) being "potentially of greater concern than PFOS given its much longer elimination half-life in humans." The paper explains "firefighters can be significantly exposed to PFHxS and other PFAS from firefighting foam via various occupational mechanisms including direct exposure during use as well as exposure from contaminated personal protective equipment (PPE), handling of contaminated equipment, managing PFAS foam wastes, occupation of contaminated fire stations and consumption of contaminated local water and produce. Cross-contamination and legacy PFAS residues from inadequately decontaminated appliances after transitioning to fluorine-free foam can remain a long-term problem." The panel concluded "[o]ngoing exposure to PFHxS, PFOS and other PFAS amongst firefighters remains a major occupational health issue," noting "[b]io-accumulation and very slow bioelimination may be very significant influencing factors in PFHxS exposure" in firefighters.

158.     In June 2020, scientists at the University of Notre Dame published a groundbreaking study on PFAS in turnout gear, and the exposure risks posed to firefighters who wear, wore, or handle such gear ("Notre Dame Turnout Study"). The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by six U.S. manufacturers, including Defendants MSA/Globe, Lion and Honeywell, over several production years.

159.     The Notre Dame Turnout Study noted these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from

FILED DATE: 11/25/2024 9:03 PM    2024L013304

textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form of side-chain fluoropolymers."   According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of gear.  The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, NEtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin.

160.   These findings suggest PFAS from the outer shell and the moisture barrier can migrate from the turnouts and contaminate both the firefighter, their apparatus and workplace with PFAS.  The analysis also indicated fluoropolymers from the outer layer decompose into other PFAS, including PFOA.

161.   The researchers also reported "garment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in the laboratory."  The accumulation of PFAS on researchers' hands strongly suggests transference of ppm levels of PFAS can occur merely by handling the turnouts and PFAS exposure pathways include inhalation, ingestion and/or absorption (through dermal contact) – all of which DuPont internally acknowledged as being toxic in 1980. Such exposure pathways are a concern not only for firefighters relying on turnouts to protect them from heat, fire, water, and chemical hazards in the field, but to family members who may be exposed to the PFAS in turnouts as the result of home washing or storage. Lead researcher Graham Peaslee commented turnouts are "the most

highly fluorinated textiles I've ever seen" and the level of PFAS in the turnout gear means firefighters are "swimming in a sea of [PFAS]."

162.    Despite these findings, Defendants have been quick to mischaracterize, dismiss or downplay the significance of the Notre Dame Turnout Study. Defendant MSA/Globe, when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."

163.    Defendant Lion's responses have been similar and have also dismissed or minimized the significance of the Notre Dame Turnout Study's findings. On June 6, 2020, Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your Lion turnout gear continues to be safe and ready for action, especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

164.    The Customer Safety Alert goes on to stress Lion does not use PFOA or PFOS (two long-chain PFAS chemicals) in its turnouts.   It does not, however, address Lion's turnouts in fact contain other PFAS chemicals, nor warn firefighters or the public about health harms associated with exposure to these toxic, bio-accumulating chemicals.

165.    As noted above, Defendant Lions' paid consultant, Dr. Paul Chrostowski, also has disparaged the Notre Dame Turnout Study and its findings. Addressing a Fire Rescue magazine article about the study, Chrostowski repeated Lion's website statement "PFOA was never part of the gear itself and frequent independent testing has found only trace amounts of it in any of the gear - not nearly enough to cause concern, and in amounts similar to consumer products." Chrostowski went on to say, "the fact is that one may find trace amounts of "short-chain" PFAS

FILED DATE: 11/25/2024 9:03 PM    2024L013304

FILED DATE: 11/25/2024 9:03 PM    2024L013304

such as PFBS and PFHxA in firefighting textiles, but the scientific research shows that these materials are far less toxic than even PFOA and at the tiny trace levels the risk are extremely low based on numerous credible published scientific research papers.  Finally, Chrostowski falsely stated the link between PFAS exposure and cancer is "extremely weak."

166.    Lion has admitted publicly that dermal absorption is a pathway of exposure to cancer-causing chemicals for firefighters.  In Lion's *Not in Our House* cancer awareness fact sheet currently on the company's website, Lion warns firefighters: "For every 5 degree increase in temperature, skin becomes 400% more absorbent. The hotter you are, the more carcinogens your skin absorbs."   This statistic is alarming given the core body temperature of firefighters routinely increases during firefighting activities while wearing turnouts which contain known carcinogens.

167.    Similarly, Defendant Honeywell stated: "The skin on the neck is very thin and prone to absorbing carcinogenic particulates."

168.    Another recent Harvard study examining PFAS levels in fire stations dust found "dust in turnout gear locker areas and adjoining apparatus bays had significantly higher fluorine concentrations compared to living rooms in fire stations," as well as fluorine concentrations typically found in in Class B foam and/or textiles as opposed to consumer products.

169.    For years, the IAFF has held a yearly cancer summit and until 2021, had done little to address the PFAS in turnouts. Defendants, including at least DuPont, Gore, Lion, and MSA/Globe, have been regular sponsors of the IAFF Cancer Summit.

170.    At this event, as well as in firefighter cancer-related publications, programs and events, Defendants repeatedly used the summit as an opportunity to push the narrative incidence of cancer among firefighters is attributable either to other chemicals encountered in the line of

FILED DATE: 11/25/2024 9:03 PM    2024L013304

duty, or firefighters' failure to wash their turnouts after every call.  Not once have the turnout Defendants admitted the PFAS materials in their products has been found to be carcinogenic, and instead of protecting firefighters, this equipment is causing the most harm.

### G.    Defendants Could Have Technologically and Economically Designed Safer Firefighting Foams and Turnouts

171.    Defendants have long known safer, reasonable, alternative designs existed, and could be utilized. These designs are and were not only feasible technologically, but also economically.

172.    In the early 2000s, 3M, in conjunction with Solberg Scandinavian had developed Re-Healing Foam ("RF"), a high-performance, AFFF-comparable product containing no fluorochemicals, and resulted in two patents and three commercial products of PFAS-free firefighting foam.  RF met the standard of "ICAO [International Civil Aviation Organization] Level B and matched AFFF in performance including a US MIL-Spec product."  In 2007, Solberg bought 3M's patent rights to RF and continued to market and sell RF.  In 2011, Defendant Amerex acquired Solberg and continued to manufacture, market, and sell RF. In 2014, the EPA presented Solberg with the Presidential Green Chemistry Challenge Award for its fluorine-free foams; the award recognizes technologies preventing pollution and matching or improving the performance of existing products. In 2018, Defendant Perimeter Solutions in 2018 acquired Solberg and continued to manufacture, market, and sell RF.

173.    Beginning in the early 2000s, BIOEX launched a highly effective, fluorinefree Class B F3 foam which has been approved and used by international airports, fire departments, oil and gas companies, the marine industry, and pharmaceutical and chemical companies around the world.

FILED DATE: 11/25/2024 9:03 PM 2024L013304

174.     However, lobbyists and companies invested in maintaining profits on fluorinated Class B foam not only continued to represent PFAS-containing foam was safe, but also intentionally maligned the fluorine free foams, falsely asserting these foams were less effective and more expensive.

175.     In 2011, the Fire Fighting Foam Coalition, which includes Defendants Tyco, DuPont, Dynax, Kidde, and Buckeye, misrepresented a U.S. Navy Report comparing Solberg's fluorine-free RF with Defendant National Foam's 6-Em AFFF and Defendant Buckeye's FC-3MS AFFF, asserting Solberg's RF was less effective.  In fact, though Solberg's RF was not made per military specifications as it did not include fluorine, the U.S. Navy Report found the opposite.

176.     The technology to develop safer, effective, and economical fluorine-free Class B foam is and has been available for at least over 20 years. In fact, many firefighting foam manufacturers and distributors manufacture, market and/or sell fluorine-free firefighting foams, including Defendants Tyco, Perimeter Solutions, Chemguard, Johnson Controls, and National Foam.

177.     Safe fluorine turnout gear was and is also technologically and economically feasible.

178.     Defendant Fire-Dex manufactures, markets and sells an entire line of PFAS-free turnouts, as well as non-fluorinated fabrics from Safety Components with a PFAS-free water-repellent with no redaction for performance.

179.     Defendants MSA/Globe, Honeywell, Tencate, and Gore have developed, manufactured, marketed and/or sold PFAS-free waterproofing technology, PFAS-free outer shells in turnout gear, and/or durable PFAS-free fabrics.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

180.    Defendant Honeywell has admitted these PFAS-free alternatives are safe, feasible and economical: "Any minor tradeoffs with PFAS-free fabrics are outweighed by worker safety. And the protection level is unchanged. PFAS-free gear offers the same thermal protection and moves the same way. The color fastness and wear remain the same."

181.    While the technology to develop fluorine-free turnout gear has been available for years, the NFPA turnout standards-setting technical committee continues to adhere to certain guidelines for turnout gear which require PFAS – knowingly putting firefighters at risk for exposure to PFAS. This committee is comprised of industry consultants, textile and gear manufacturers, including Defendants MSA/Globe, Lion, Tyco, and Honeywell.

182.    The economic and technological feasibility of fluorine-free foams and turnout gear is well-established and based on technology available for years. The alternative designs detailed above are far safer for firefighters and eliminate the serious health risks from PFAS exposure.

183.    The only barrier to producing safer alternatives to PFAS-containing foams and turnout gear has been Defendants' opposition. Their continued manufacturing, marketing, selling, promoting and/or distributing PFAS-containing foams and turnout gear has exposed firefighters to toxic PFAS chemicals. These defective designs have been a substantial factor in causing Plaintiff's Decedent's cancer.

## COUNT I

## ESTATE OF RONALD SHULGA-Negligence-Wrongful Death

184.    MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, deceased, incorporates by reference Paragraphs 1-183 of this Complaint as though fully set forth herein.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

185.    Plaintiff's Decedent, RONALD SHULGA was a firefighter/paramedic who served with the City of Evanston as a fire captain/paramedic and worked in various fire stations, engines, trucks, and/or specialized companies throughout the City of Evanston from 1987 until 2016.

186.    RONALD SHULGA's firefighter/paramedic training included: building construction, fire appliances, pump operations, ladders, search and rescue, ventilation, utility control, salvage and overhaul, vehicle extrication, incident command, and first aid. In the course of firefighting training and fire suppression activities, RONALD SHULGA routinely wore turnouts and used or was exposed to Class B Foam.

187.    As a result of his exposure to PFAS during his work as a firefighter, RONALD SHULGA developed Non-Hodgkin lymphoma which resulted in his death.

188.    Defendants owed a duty of care towards RONALD SHULGA commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally persistent, toxic, and bio-accumulative nature of Class B foams and turnouts containing PFAS or PFAS- containing materials.

189.    Defendants had a duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users, production of information materials, use and/or distribution of Class B foam and/or turnouts into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or bodies of the firefighters, including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

190.    Defendants had a duty to exercise reasonable care to ensure Class B foams and/or turnouts were manufactured, marketed, and sold in such a way as to ensure the end users of Class B foam and/or turnouts were aware of the potential harm that PFAS can cause to human health.

191.    Defendants had a duty to warn of the hazards associated with PFAS and PFAS- containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the Class B foams and/or turnouts.

192.    At the time the Defendants' respective products left their control, they were in an unreasonably dangerous condition because they contained PFAS and PFAS-containing chemicals which are hazardous to human health.

193.    At all relevant times, Defendants, individually, and through their respective agents, employees, and representatives, were negligent in one or more of the following ways:

a.    Designed, tested, manufactured, formulated, marketed, promoted, supplied, sold and/or distributed PFAS chemical and PFAS-containing products when they knew or should have known exposure to these products was hazardous to human health;

b.    Recommended application and/or disposal techniques for PFAS and/or PFAS-containing products they knew or should have known would lead to exposure hazardous to human health;

c.    Failed to warn of the presence of PFAS and/or PFAS-containing products;

d.    Failed to warn of the health hazards of PFAS; and,

e.    Underreported, underestimated, and downplayed the human health hazards posed by PFAS and/or PFAS-containing products.

194.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, Plaintiff's Decedent, RONALD SHULGA was exposed to significant levels of PFAS which resulted in his death due to Non-Hodgkin Lymphoma.

FILED DATE: 11/25/2024 9:03 PM   2024L013304

195.     Plaintiff's Decedent, RONALD SHULGA, left surviving as his heirs and next of kin: his wife, Mary Klebba-Shulga and his adult child, Sarah Ann Shulga Manalo, both who have sustained grief, sorrow, pecuniary loss, and damages as a result of his death, including loss of society, companionship, love, and affection.

196.     Plaintiff, MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, brings this Wrongful Death cause of action pursuant to 740 ILCS 180/1 commonly known as the Illinois Wrongful Death Act.

197.     MARY KLEBBA-SHULGA discovered a connection between these products and Decedent, RONALD SHULGA's death less than two years before the filing of this Complaint.

WHEREFORE Plaintiff, MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, demands judgment against Defendants, 3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING, CO.); TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC.; ARKEMA, INC.; BUCKEYE FIRE EQUIPMENT CO.; CARRIER GLOBAL CORPORATION; DYNAX CORPORATION; E.I. DU PONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC.; LION APPAREL INC.; LION GROUP, INC.; GLOBE MANUFACTURING COMPANY LLC; MINE SAFETY APPLIANCE COMPANY LLC; NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC.; PERIMETER SOLUTIONS, LP; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN MILLS INC.; W.L. GORE & ASSOCIATES, INC.; KIDDE FIRE FIGHTING

FILED DATE: 11/25/2024 9:03 PM    2024L013304

INC., (f/k/a CHUBB NATIONAL FOAM, INC. f/k/a NATIONAL FOAM INC.); KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; KFI WIND-DOWN CORP., (f/k/a KIDDE-FENWAL, INC., f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC., and successor-in-interest to NATIONAL FOAM, INC.), individually and d/b/a CARRIER FIRE & SECURITY AMERICAS CORPORATION; THE CHEMOURS COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; THE CHEMOURS COMPANY FC, LLC, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; CHEMGUARD, INC.; ALLSTAR EQUIPMENT CO.; CB GARMENT, INC., d/b/a  CREWBOSS; CHEMDESIGN PRODUCTS INC.; CHEMICALS, INC.; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; GLOBE HOLDING COMPANY, LLC; INNOTEX CORPORATION; LAKELAND INDUSTRIES, INC.; L.N. CURTIS & SONS; MALLORY SAFETY AND SUPPLY, LLC; MILLIKEN & COMPANY; MSA SAFETY SALES, LLC; MSA SAFETY INCORPORATED; MUNICIPAL EMERGENCY SERVICES, INC.; NARCOTE, LLC (f/k/a STEDFAST INC., and/or STEDFAST USA, INC.); NARCOTE HOLDING CORPORATION (f/k/a STEDFAST INC., and/or STEDFAST USA, INC.); NATION FORD CHEMICAL COMPANY; RICOCHET MANUFACTURING CO., INC.; SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.; RTX CORPORATION, as successor-in-interest to UNITED TECHNOLOGIES CORPORATION, a/k/a RAYTHEON TECHNOLOGIES CORPORATION; VERIDIAN LIMITED d/b/a VERIDIAN FIRE PROTECTIVE GEAR; and WITMER PUBLIC SAFETY

FILED DATE: 11/25/2024 9:03 PM    2024L013304

GROUP, INC. d/b/a "THE FIRE STORE", and each of them, in an amount exceeding the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT II

### ESTATE OF RONALD SHULGA-Strict Liability–Wrongful Death

198.    MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, incorporates by reference Paragraphs 1-183 of this Complaint as though fully set forth herein.

199.    Plaintiff's Decedent, RONALD SHULGA was a firefighter/paramedic who served with the City of Evanston as a fire captain/paramedic and worked in various fire stations, engines, trucks, and/or specialized companies throughout the City of Evanston from 1987 until 2016.

200.    RONALD SHULGA's firefighter/paramedic training included: building construction, fire appliances, pump operations, ladders, search and rescue, ventilation, utility control, salvage and overhaul, vehicle extrication, incident command, and first aid. In the course of firefighting training and fire suppression activities, RONALD SHULGA routinely wore turnouts and used or was exposed to Class B Foam.

201.    As a result of his exposure to PFAS during his work as a firefighter, RONALD SHULGA developed Non-Hodgkins lymphoma which resulted in his death.

202.    Defendants owed a duty of care towards RONALD SHULGA commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally persistent, toxic, and bio-accumulative nature of Class B foams and turnouts containing PFAS or PFAS-containing materials.

FILED DATE: 11/25/2024 9:03 PM 2024L013304

203.    RONALD SHULGA used Defendants' products as intended and instructed.

204.    At all relevant times, and before the Defendants' PFAS and/or PFAS-containing products left their control, they were unreasonably dangerous in one or both of the following ways:

      a.    They were designed and/or manufactured to contain chemicals hazardous to human health; and

      b.    They were not accompanied by nor did they contain warnings relating to human health hazards caused by the chemicals they contained.

205.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, Plaintiff's Decedent, RONALD SHULGA, was exposed to significant levels of PFAS which resulted in his death due to Non-Hodgkins lymphoma.

206.    Plaintiff's Decedent, RONALD SHULGA, left surviving as his heirs and next of kin: his wife, Mary Klebba-Shulga and his adult child, Sarah Ann Shulga Manalo, both who have sustained grief, sorrow, pecuniary loss, and damages as a result of his death, including loss of society, companionship, love, and affection.

207.    Plaintiff, MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, brings this Wrongful Death cause of action pursuant to 740 ILCS 180/1 commonly known as the Illinois Wrongful Death Act.

208.    MARY KLEBBA-SHULGA discovered a connection between these products and Decedent, RONALD SHULGA's, death less than two years before the filing of this Complaint.

WHEREFORE Plaintiff, MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, demands judgment against Defendants, 3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING, CO.); TYCO FIRE

FILED DATE: 11/25/2024 9:03 PM    2024L013304

PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC.; ARKEMA, INC.; BUCKEYE FIRE EQUIPMENT CO.; CARRIER GLOBAL CORPORATION; DYNAX CORPORATION; E.I. DU PONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC.; LION APPAREL INC.; LION GROUP, INC.; GLOBE MANUFACTURING COMPANY LLC; MINE SAFETY APPLIANCE COMPANY LLC; NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC.; PERIMETER SOLUTIONS, LP; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN MILLS INC.; W.L. GORE & ASSOCIATES, INC.; KIDDE FIRE FIGHTING INC., (f/k/a CHUBB NATIONAL FOAM, INC. f/k/a NATIONAL FOAM INC.); KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; KFI WIND-DOWN CORP., (f/k/a KIDDE-FENWAL, INC., f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC., and successor-in-interest to NATIONAL FOAM, INC.), individually and d/b/a CARRIER FIRE & SECURITY AMERICAS CORPORATION; THE CHEMOURS COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; THE CHEMOURS COMPANY FC, LLC, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; CHEMGUARD, INC.; ALLSTAR EQUIPMENT CO.; CB GARMENT, INC., d/b/a  CREWBOSS; CHEMDESIGN PRODUCTS INC.; CHEMICALS, INC.; CLARIANT CORPORATION; CORTEVA, INC.;

FILED DATE: 11/25/2024 9:03 PM    2024L013304

DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; GLOBE HOLDING

COMPANY, LLC; INNOTEX CORPORATION; LAKELAND INDUSTRIES, INC.; L.N.

CURTIS & SONS; MALLORY SAFETY AND SUPPLY, LLC; MILLIKEN & COMPANY;

MSA SAFETY SALES, LLC; MSA SAFETY INCORPORATED; MUNICIPAL

EMERGENCY SERVICES, INC.; NARCOTE, LLC (f/k/a STEDFAST INC., and/or

STEDFAST USA, INC.); NARCOTE HOLDING CORPORATION (f/k/a STEDFAST INC.,

and/or STEDFAST USA, INC.); NATION FORD CHEMICAL COMPANY; RICOCHET

MANUFACTURING CO., INC.; SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.;

RTX CORPORATION, as successor-in-interest to UNITED TECHNOLOGIES

CORPORATION, a/k/a RAYTHEON TECHNOLOGIES CORPORATION; VERIDIAN

LIMITED d/b/a VERIDIAN FIRE PROTECTIVE GEAR; and WITMER PUBLIC SAFETY

GROUP, INC. d/b/a "THE FIRE STORE", and each of them, in an amount exceeding the

minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook

County, Illinois.

## COUNT III

### ESTATE OF RONALD SHULGA-Breach of Implied Warranty of Merchantability-Wrongful Death

209.    MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD

SHULGA, Deceased, incorporates by reference Paragraphs 1-183 of this Complaint as though

fully set forth herein.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

210.     Plaintiff's Decedent, RONALD SHULGA was a firefighter/paramedic who served with the  City of Evanston as a fire caption/paramedic and worked in various fire stations, engines, trucks, and/or specialized companies throughout the City of Evanston from 1987 until 2016.

211.     RONALD SHULGA's firefighter/paramedic training included: building construction, fire appliances, pump operations, ladders, search and rescue, ventilation, utility control, salvage and overhaul, vehicle extrication, incident command, and first aid. In the course of firefighting training and fire suppression activities, RONALD SHULGA routinely wore turnouts and used or was exposed to Class B Foam.

212.     As a result of his exposure to PFAS during his work as a firefighter, RONALD SHULGA developed Non-Hodgkins lymphoma which resulted in his death.

213.     Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired,  has engaged in the business of designing, manufacturing, distributing, supplying, and/or selling turnouts and/or Class B foam and, by doing so, impliedly warranted the turnouts and/or Class B foams were merchantable, safe, and fit for ordinary purposes for which they were used, including for use by firefighters such as RONALD SHULGA.

214.     Defendants knowingly placed PFAS and/or PFAS-containing turnouts and/or Class B foam into the stream of commerce with full knowledge they were sold to fire departments or to companies selling turnouts and/or Class B foam to fire departments for use by firefighters such as RONALD SHULGA who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities, including training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

FILED DATE: 11/25/2024 9:03 PM   2024L013304

215.     Defendants intended the PFAS and/or PFAS-containing turnouts and/or Class B foam they were manufacturing, distributing, supplying, and/or selling would be used by firefighters, including RONALD SHULGA, without any substantial change in the condition of the products from when the products were initially designed, manufactured, distributed, supplied, and/or sold by Defendants.

216.     RONALD SHULGA used and/or was exposed to these PFAS-containing products in the ways Defendants intended them to be used and for the ordinary purposes for which these products were intended.

217.     RONALD SHULGA used and/or was exposed to these PFAS-containing products in ways foreseeable to Defendants.

218.     RONALD SHULGA was exposed to PFAS by using Defendants' PFAS-containing turnouts and/or Class B foam in the course of his firefighting activities, as described above, without knowledge of the turnouts' and/or Class B foam's dangerous and hazardous properties.

219.     The turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by Defendants and used by RONALD SHULGA contained PFAS or PFAS-containing materials so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, the turnouts and/or Class B foam are defective in design and/or are unreasonably dangerous, unsuitable, and not safe for use by firefighters even when used as directed by the manufacturer and for the intended purposes of firefighting activities which include training, extinguishment, ventilation, search-and rescue, salvage, containment, and overhaul.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

220.    Further, knowing of the dangerous and hazardous properties of turnouts and Class B foam, Defendants could have designed, manufactured, distributed, supplied, and/or sold reasonable alternative designs or formulations of turnouts and/or Class B foam not containing PFAS.  Such alternative designs would have been safer for consumer firefighters and would have reduced or prevented RONALD SHULGA's harm. These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

221.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to RONALD SHULGA caused by the Defendants' design, manufacture, distribution, supply, and/or sale of PFAS and PFAS-containing materials, including turnouts and/or Class B foam.

222.    Additionally, the turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by the Defendants contained PFAS or PFAS-containing materials so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, the act of designing, manufacturing, distributing, supplying, and selling these products was unreasonably dangerous under the circumstances.

223.    The PFAS-containing turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by the Defendants were dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of PFAS-containing turnouts and/or Class B foam.

224.    The PFAS-containing turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing products left the hands of the manufacturer or

FILED DATE: 11/25/2024 9:03 PM    2024L013304

distributors, said products were unreasonably dangerous, unreasonably dangerous in normal use, did not meet ordinary consumer-firefighter's reasonable expectations as to their safety, and were more dangerous than an ordinary consumer-firefighter would expect.

225.     The PFAS-containing turnouts and/or Class B foam were in a defective condition and unsafe, and Defendants knew or had reason to know these PFAS-containing products were defective and unsafe, especially when used in the form and manner as provided by Defendants.

226.     When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were defective in design and formulation and as a result, failed to meet ordinary users' expectations as to their safety, failed to perform as an ordinary user would expect, and failed to contain adequate or appropriate warnings.

227.     When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.

228.     When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were unreasonably dangerous because they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

229.     When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

230.     Exposure to PFAS presents a risk of grave and harmful side effects and injuries outweighing any potential utility stemming from their use.

231.     Defendants knew or should have known at the time of designing, manufacturing, distributing, supplying and/or selling their PFAS-containing turnouts and/or Class B foam,

FILED DATE: 11/25/2024 9:03 PM    2024L013304

exposure to PFAS by firefighters, including Fire Captain/Paramedic RONALD SHULGA, could result in cancer and other grave and serious illnesses and injuries as alleged herein.

232.    The unreasonably dangerous design defects in turnouts and/or Class B foam containing PFAS exposed RONALD SHULGA to toxic levels of PFAS and therefore, was a proximate cause of his injuries and damages which resulted in his death, as described herein.

233.    As a result of Defendants' design and formulation of a defective product, Defendants are liable for damages to MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased.

234.    As a direct and proximate result of the foregoing acts and/or omissions, Plaintiff's Decedent, RONALD SHULGA, suffered injuries and damages described herein which resulted in his death.

235.    Defendants acted with willful or conscious disregard for the rights, health, and safety of Decedent, RONALD SHULGA, as described herein, thereby entitling RONALD SHULGA to an award of punitive damages.

WHEREFORE Plaintiff, MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, demands judgment against Defendants, 3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING, CO.); TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC.; ARKEMA, INC.; BUCKEYE FIRE EQUIPMENT CO.; CARRIER GLOBAL CORPORATION; DYNAX CORPORATION; E.I. DU PONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON

FILED DATE: 11/25/2024 9:03 PM    2024L013304

CONTROLS, INC.; LION APPAREL INC.; LION GROUP, INC.; GLOBE

MANUFACTURING COMPANY LLC; MINE SAFETY APPLIANCE COMPANY LLC;

NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC.; PERIMETER

SOLUTIONS, LP; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA d/b/a

SOUTHERN MILLS INC.; W.L. GORE & ASSOCIATES, INC.; KIDDE FIRE FIGHTING

INC., (f/k/a CHUBB NATIONAL FOAM, INC. f/k/a NATIONAL FOAM INC.); KIDDE PLC,

INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.), individually and as

successor-in-interest to NATIONAL FOAM, INC.; KFI WIND-DOWN CORP., (f/k/a KIDDE-

FENWAL, INC., f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL

FOAM, INC.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE

INTERLOGIX, INC., and successor-in-interest to NATIONAL FOAM, INC.), individually and

d/b/a CARRIER FIRE & SECURITY AMERICAS CORPORATION; THE CHEMOURS

COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS

ENTERPRISE; THE CHEMOURS COMPANY FC, LLC, individually and as successor-in-

interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; CHEMGUARD, INC.;

ALLSTAR EQUIPMENT CO.; CB GARMENT, INC., d/b/a  CREWBOSS; CHEMDESIGN

PRODUCTS INC.; CHEMICALS, INC.; CLARIANT CORPORATION; CORTEVA, INC.;

DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; GLOBE HOLDING

COMPANY, LLC; INNOTEX CORPORATION; LAKELAND INDUSTRIES, INC.; L.N.

CURTIS & SONS; MALLORY SAFETY AND SUPPLY, LLC; MILLIKEN & COMPANY;

MSA SAFETY SALES, LLC; MSA SAFETY INCORPORATED; MUNICIPAL

EMERGENCY SERVICES, INC.; NARCOTE, LLC (f/k/a STEDFAST INC., and/or

STEDFAST USA, INC.); NARCOTE HOLDING CORPORATION (f/k/a STEDFAST INC.,

and/or STEDFAST USA, INC.); NATION FORD CHEMICAL COMPANY; RICOCHET MANUFACTURING CO., INC.; SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.; RTX CORPORATION, as successor-in-interest to UNITED TECHNOLOGIES CORPORATION, a/k/a RAYTHEON TECHNOLOGIES CORPORATION; VERIDIAN LIMITED d/b/a VERIDIAN FIRE PROTECTIVE GEAR; and WITMER PUBLIC SAFETY GROUP, INC. d/b/a "THE FIRE STORE", and each of them, in an amount exceeding the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

**COUNT IV**

**ESTATE OF RONALD SHULGA -Negligence-Survival Action**

236.    MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, incorporates by reference Paragraphs 1-183 of this Complaint as though fully set forth herein.

237.    Plaintiff's Decedent, RONALD SHULGA was a firefighter/paramedic who served with the City of Evanston as a fire captain/paramedic and worked in various fire stations, engines, trucks, and/or specialized companies throughout the City of Evanston from 1987 until 2016.

238.    RONALD SHULGA's firefighter/paramedic training included: building construction, fire appliances, pump operations, ladders, search and rescue, ventilation, utility control, salvage and overhaul, vehicle extrication, incident command, and first aid. In the course of firefighting training and fire suppression activities, RONALD SHULGA routinely wore turnouts and used or was exposed to Class B Foam.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

FILED DATE: 11/25/2024 9:03 PM    2024L013304

239.    As a result of his exposure to PFAS during his work as a firefighter, RONALD SHULGA developed Non-Hodgkins lymphoma which resulted in his death.

240.    Defendants owed a duty of care towards RONALD SHULGA commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally persistent, toxic, and bio-accumulative nature of Class B foams and turnouts containing PFAS or PFAS-containing materials.

241.    Defendants had a duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users, production of information materials, use and/or distribution of Class B foam and/or turnouts into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or bodies of the firefighters, including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects.

242.    Defendants had a duty to exercise reasonable care to ensure Class B foams and/or turnouts were manufactured, marketed, and sold in such a way as to ensure the end users of Class B foam and/or turnouts were aware of the potential harm that PFAS can cause to human health.

243.    Defendants had a duty to warn of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the Class B foams and/or turnouts.

244.    At the time the Defendants' respective products left their control, they were in an unreasonably dangerous condition because they contained PFAS and PFAS-containing chemicals which are hazardous to human health.

245.    At all relevant times, Defendants, individually, and through their respective agents, employees, and representatives, were negligent in one or more of the following ways:

FILED DATE: 11/25/2024 9:03 PM   2024L013304

a. Designed, tested, manufactured, formulated, marketed, promoted, supplied, sold and/or distributed PFAS chemical and PFAS-containing products when they knew or should have known exposure to these products was hazardous to human health;

b. Recommended application and/or disposal techniques for PFAS and/or PFAS-containing products they knew or should have known would lead to exposure hazardous to human health;

c. Failed to warn of the presence of PFAS and/or PFAS-containing products;

d. Failed to warn of the health hazards of PFAS; and,

e. Underreported, underestimated, and downplayed the human health hazards posed by PFAS and/or PFAS-containing products.

246. As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions, Plaintiff's Decedent, RONALD SHULGA was exposed to significant levels of PFAS sustaining injuries of a personal and pecuniary nature prior to his death and had he survived, he would have been competent to bring this cause of action in his own name, and this action has survived him.

247. Plaintiff, MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, brings this survival action pursuant to 735 Illinois Compiled Statutes 5/2706, commonly known as the Survival Act of the State of Illinois.

248. MARY KLEBBA-SHULGA discovered a connection between these products and Decedent, RONALD SHULGA's, death less than two years before the filing of this Complaint.

WHEREFORE Plaintiff, MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, demands judgment against Defendants, 3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING, CO.); TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC.; ARKEMA, INC.;

FILED DATE: 11/25/2024 9:03 PM    2024L013304

BUCKEYE FIRE EQUIPMENT CO.; CARRIER GLOBAL CORPORATION; DYNAX CORPORATION; E.I. DU PONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC.; LION APPAREL INC.; LION GROUP, INC.; GLOBE MANUFACTURING COMPANY LLC; MINE SAFETY APPLIANCE COMPANY LLC; NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC.; PERIMETER SOLUTIONS, LP; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN MILLS INC.; W.L. GORE & ASSOCIATES, INC.; KIDDE FIRE FIGHTING INC., (f/k/a CHUBB NATIONAL FOAM, INC. f/k/a NATIONAL FOAM INC.); KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; KFI WIND-DOWN CORP., (f/k/a KIDDE-FENWAL, INC., f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC., and successor-in-interest to NATIONAL FOAM, INC.), individually and d/b/a CARRIER FIRE & SECURITY AMERICAS CORPORATION; THE CHEMOURS COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; THE CHEMOURS COMPANY FC, LLC, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; CHEMGUARD, INC.; ALLSTAR EQUIPMENT CO.; CB GARMENT, INC., d/b/a CREWBOSS; CHEMDESIGN PRODUCTS INC.; CHEMICALS, INC.; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; GLOBE HOLDING COMPANY, LLC; INNOTEX CORPORATION; LAKELAND INDUSTRIES, INC.; L.N.

FILED DATE: 11/25/2024 9:03 PM  2024L013304

CURTIS & SONS; MALLORY SAFETY AND SUPPLY, LLC; MILLIKEN & COMPANY;

MSA SAFETY SALES, LLC; MSA SAFETY INCORPORATED; MUNICIPAL

EMERGENCY SERVICES, INC.; NARCOTE, LLC (f/k/a STEDFAST INC., and/or

STEDFAST USA, INC.); NARCOTE HOLDING CORPORATION (f/k/a STEDFAST INC.,

and/or STEDFAST USA, INC.); NATION FORD CHEMICAL COMPANY; RICOCHET

MANUFACTURING CO., INC.; SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.;

RTX CORPORATION, as successor-in-interest to UNITED TECHNOLOGIES

CORPORATION, a/k/a RAYTHEON TECHNOLOGIES CORPORATION; VERIDIAN

LIMITED d/b/a VERIDIAN FIRE PROTECTIVE GEAR; and WITMER PUBLIC SAFETY

GROUP, INC. d/b/a "THE FIRE STORE", and each of them, in an amount exceeding the

minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook

County, Illinois.

## COUNT V

## ESTATE OF RONALD SHULGA -Strict Liability–Survival Action

249.     MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD

SHULGA, Deceased,  incorporates by reference Paragraphs 1-183 of this Complaint as though

fully set forth herein.

250.     Plaintiff's Decedent, RONALD SHULGA was a firefighter/paramedic who

served with the City of Evanston as a fire captain/paramedic and worked in various fire stations,

engines, trucks, and/or specialized companies throughout the City of Evanston from 1987 until

2016.

251.     RONALD SHULGA's firefighter/paramedic training included: building

construction, fire appliances, pump operations, ladders, search and rescue, ventilation, utility

68

FILED DATE: 11/25/2024 9:03 PM    2024L013304

control, salvage and overhaul, vehicle extrication, incident command, and first aid. In the course of firefighting training and fire suppression activities, RONALD SHULGA routinely wore turnouts and used or was exposed to Class B Foam.

252.     As a result of his exposure to PFAS during his work as a firefighter, RONALD SHULGA developed TYPE OF CANCER which resulted in his death.

253.     Defendants owed a duty of care towards RONALD SHULGA commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally persistent, toxic, and bio-accumulative nature of Class B foams and turnouts containing PFAS or PFAS-containing materials.

254.     RONALD SHULGA used Defendants' products as intended and instructed.

255.     At all relevant times, and before the Defendants' PFAS and/or PFAS-containing products left their control, they were unreasonably dangerous in one or both of the following ways:

    a.     They were designed and/or manufactured to contain chemicals hazardous to human health; and

    b.     They were not accompanied by nor did they contain warnings relating to human health hazards caused by the chemicals they contained.

255.     As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions, plaintiff's decedent, RONALD SHULGA was exposed to significant levels of PFAS sustaining injuries of a personal and pecuniary nature prior to his death and had he survived, he would have been competent to bring this cause of action in his own name, and this action has survived him.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

256.    Plaintiff MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, brings this survival action pursuant to 735 Illinois Compiled Statutes 5/2706, commonly known as the Survival Act of the State of Illinois.

257.    MARY KLEBBA-SHULGA discovered a connection between these products and Decedent, RONALD SHULGA's, death less than two years before the filing of this Complaint.

WHEREFORE Plaintiff, MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, demands judgment against Defendants, 3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING, CO.); TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC.; ARKEMA, INC.; BUCKEYE FIRE EQUIPMENT CO.; CARRIER GLOBAL CORPORATION; DYNAX CORPORATION; E.I. DU PONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC.; LION APPAREL INC.; LION GROUP, INC.; GLOBE MANUFACTURING COMPANY LLC; MINE SAFETY APPLIANCE COMPANY LLC; NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC.; PERIMETER SOLUTIONS, LP; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN MILLS INC.; W.L. GORE & ASSOCIATES, INC.; KIDDE FIRE FIGHTING INC., (f/k/a CHUBB NATIONAL FOAM, INC. f/k/a NATIONAL FOAM INC.); KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; KFI WIND-DOWN CORP., (f/k/a KIDDE-

FILED DATE: 11/25/2024 9:03 PM    2024L013304

FENWAL, INC., f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC., and successor-in-interest to NATIONAL FOAM, INC.), individually and d/b/a CARRIER FIRE & SECURITY AMERICAS CORPORATION; THE CHEMOURS COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; THE CHEMOURS COMPANY FC, LLC, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; CHEMGUARD, INC.; ALLSTAR EQUIPMENT CO.; CB GARMENT, INC., d/b/a CREWBOSS; CHEMDESIGN PRODUCTS INC.; CHEMICALS, INC.; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; GLOBE HOLDING COMPANY, LLC; INNOTEX CORPORATION; LAKELAND INDUSTRIES, INC.; L.N. CURTIS & SONS; MALLORY SAFETY AND SUPPLY, LLC; MILLIKEN & COMPANY; MSA SAFETY SALES, LLC; MSA SAFETY INCORPORATED; MUNICIPAL EMERGENCY SERVICES, INC.; NARCOTE, LLC (f/k/a STEDFAST INC., and/or STEDFAST USA, INC.); NARCOTE HOLDING CORPORATION (f/k/a STEDFAST INC., and/or STEDFAST USA, INC.); NATION FORD CHEMICAL COMPANY; RICOCHET MANUFACTURING CO., INC.; SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.; RTX CORPORATION, as successor-in-interest to UNITED TECHNOLOGIES CORPORATION, a/k/a RAYTHEON TECHNOLOGIES CORPORATION; VERIDIAN LIMITED d/b/a VERIDIAN FIRE PROTECTIVE GEAR; and WITMER PUBLIC SAFETY GROUP, INC. d/b/a "THE FIRE STORE", and each of them, in an amount exceeding the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

## COUNT VI

### ESTATE OF RONALD SHULGA-Breach of Implied Warranty of Merchantability-Survival Action

258.    MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD

SHULGA, Deceased, incorporates by reference Paragraphs 1-183 of this Complaint as though

fully set forth herein.

259.    Plaintiff's Decedent, RONALD SHULGA was a firefighter/paramedic who

served with the City of Evanston as a fire captain/paramedic and worked in various fire stations,

engines, trucks, and/or specialized companies throughout the City of Evanston from 1987 until

2016.

260.    RONALD SHULGA's firefighter training included: building construction, fire

appliances, pump operations, ladders, search and rescue, ventilation, utility control, salvage and

overhaul, vehicle extrication, incident command, and first aid. In the course of firefighting

training and fire suppression activities, RONALD SHULGA routinely wore turnouts and used or

was exposed to Class B Foam.

261.    As a result of his exposure to PFAS during his work as a firefighter, RONALD

SHULGA developed Non-Hodgkins lymphoma which resulted in his death.

262.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or

entities they have acquired,  has engaged in the business of designing, manufacturing,

distributing, supplying, and/or selling turnouts and/or Class B foam and, by doing so, impliedly

warranted the turnouts and/or Class B foams were merchantable, safe, and fit for ordinary

purposes for which they were used, including for use by firefighters such as RONALD

SHULGA.

FILED DATE: 11/25/2024 9:03 PM 2024L013304

263. Defendants knowingly placed PFAS and/or PFAS-containing turnouts and/or Class B foam into the stream of commerce with full knowledge they were sold to fire departments or to companies selling turnouts and/or Class B foam to fire departments for use by firefighters such as RONALD SHULGA who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities, including training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

264. Defendants intended the PFAS and/or PFAS-containing turnouts and/or Class B foam they were manufacturing, distributing, supplying, and/or selling would be used by firefighters, including RONALD SHULGA, without any substantial change in the condition of the products from when the products were initially designed, manufactured, distributed, supplied, and/or sold by Defendants.

265. RONALD SHULGA used and/or was exposed to these PFAS-containing products in the ways Defendants intended them to be used and for the ordinary purposes for which these products were intended.

266. RONALD SHULGA used and/or was exposed to these PFAS-containing products in ways foreseeable to Defendants.

267. RONALD SHULGA was exposed to PFAS by using Defendants' PFAS-containing turnouts and/or Class B foam in the course of his firefighting activities, as described above, without knowledge of the turnouts' and/or Class B foam's dangerous and hazardous properties.

268. The turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by Defendants and used by RONALD SHULGA contained PFAS or PFAS-containing materials so toxic and unreasonably dangerous to human health and the environment,

FILED DATE: 11/25/2024 9:03 PM    2024L013304

with the toxic chemicals being so mobile and persistent, the turnouts and/or Class B foam are defective in design and/or are unreasonably dangerous, unsuitable, and not safe for use by firefighters even when used as directed by the manufacturer and for the intended purposes of firefighting activities which include training, extinguishment, ventilation, search-and rescue, salvage, containment, and overhaul.

269.   Further, knowing of the dangerous and hazardous properties of turnouts and Class B foam, Defendants could have designed, manufactured, distributed, supplied, and/or sold reasonable alternative designs or formulations of turnouts and/or Class B foam not containing PFAS.  Such alternative designs would have been safer for consumer firefighters and would have reduced or prevented RONALD SHULGA's harm. These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

270.   The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to RONALD SHULGA caused by the Defendants' design, manufacture, distribution, supply, and/or sale of PFAS and PFAS-containing materials, including turnouts and/or Class B foam.

271.   Additionally, the turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by the Defendants contained PFAS or PFAS-containing materials so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, the act of designing, manufacturing, distributing, supplying, and selling these products was unreasonably dangerous under the circumstances.

272.   The PFAS-containing turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by the Defendants were dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or

FILED DATE: 11/25/2024 9:03 PM    2024L013304

distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of PFAS-containing turnouts and/or Class B foam.

273.    The PFAS-containing turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing products left the hands of the manufacturer or distributors, said products were unreasonably dangerous, unreasonably dangerous in normal use, did not meet ordinary consumer-firefighter's reasonable expectations as to their safety, and were more dangerous than an ordinary consumer-firefighter would expect.

274.    The PFAS-containing turnouts and/or Class B foam were in a defective condition and unsafe, and Defendants knew or had reason to know these PFAS-containing products were defective and unsafe, especially when used in the form and manner as provided by Defendants.

275.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were defective in design and formulation and as a result, failed to meet ordinary users' expectations as to their safety, failed to perform as an ordinary user would expect, and failed to contain adequate or appropriate warnings.

276.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.

277.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were unreasonably dangerous because they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

FILED DATE: 11/25/2024 9:03 PM    2024L013304

278.     When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

279.     Exposure to PFAS presents a risk of grave and harmful side effects and injuries outweighing any potential utility stemming from their use.

280.     Defendants knew or should have known at the time of designing, manufacturing, distributing, supplying and/or selling their PFAS-containing turnouts and/or Class B foam, exposure to PFAS by firefighters, including Firefighter/paramedic RONALD SHULGA, could result in cancer and other grave and serious illnesses and injuries as alleged herein.

281.     The unreasonably dangerous design defects in turnouts and/or Class B foam containing PFAS exposed RONALD SHULGA to toxic levels of PFAS and therefore, was a proximate cause of his injuries and damages which resulted in his death, as described herein.

282.     As a result of Defendants' design and formulation of a defective product, Defendants are liable for damages to MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased.

283.     As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions, Plaintiff's Decedent, RONALD SHULGA, was exposed to significant levels of PFAS sustaining injuries of a personal and pecuniary nature prior to his death and had he survived, he would have been competent to bring this cause of action in his own name, and this action has survived him.

284.     Plaintiff MARY KLEBBA-SHULGA, Personal Representative of the Estate of RONALD SHULGA, Deceased, brings this survival action pursuant to 735 Illinois Compiled Statutes 5/2706, commonly known as the Survival Act of the State of Illinois.

FILED DATE: 11/25/2024 9:03 PM   2024L013304

WHEREFORE Plaintiff, MARY KLEBBA-SHULGA, Personal Representative the Estate of RONALD SHULGA, Deceased, demands judgment against Defendants, 3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING, CO.); TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC.; ARKEMA, INC.; BUCKEYE FIRE EQUIPMENT CO.; CARRIER GLOBAL CORPORATION; DYNAX CORPORATION; E.I. DU PONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC.; LION APPAREL INC.; LION GROUP, INC.; GLOBE MANUFACTURING COMPANY LLC; MINE SAFETY APPLIANCE COMPANY LLC; NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC.; PERIMETER SOLUTIONS, LP; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN MILLS INC.; W.L. GORE & ASSOCIATES, INC.; KIDDE FIRE FIGHTING INC., (f/k/a CHUBB NATIONAL FOAM, INC. f/k/a NATIONAL FOAM INC.); KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; KFI WIND-DOWN CORP., (f/k/a KIDDE-FENWAL, INC., f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC., and successor-in-interest to NATIONAL FOAM, INC.), individually and d/b/a CARRIER FIRE & SECURITY AMERICAS CORPORATION; THE CHEMOURS COMPANY, individually and as successor-in-interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; THE CHEMOURS COMPANY FC, LLC, individually and as successor-in-

interest to DUPONT CHEMICAL SOLUTIONS ENTERPRISE; CHEMGUARD, INC.; ALLSTAR EQUIPMENT CO.; CB GARMENT, INC., d/b/a  CREWBOSS; CHEMDESIGN PRODUCTS INC.; CHEMICALS, INC.; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; GLOBE HOLDING COMPANY, LLC; INNOTEX CORPORATION; LAKELAND INDUSTRIES, INC.; L.N. CURTIS & SONS; MALLORY SAFETY AND SUPPLY, LLC; MILLIKEN & COMPANY; MSA SAFETY SALES, LLC; MSA SAFETY INCORPORATED; MUNICIPAL EMERGENCY SERVICES, INC.; NARCOTE, LLC (f/k/a STEDFAST INC., and/or STEDFAST USA, INC.); NARCOTE HOLDING CORPORATION (f/k/a STEDFAST INC., and/or STEDFAST USA, INC.); NATION FORD CHEMICAL COMPANY; RICOCHET MANUFACTURING CO., INC.; SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.; RTX CORPORATION, as successor-in-interest to UNITED TECHNOLOGIES CORPORATION, a/k/a RAYTHEON TECHNOLOGIES CORPORATION; VERIDIAN LIMITED d/b/a VERIDIAN FIRE PROTECTIVE GEAR; and WITMER PUBLIC SAFETY GROUP, INC. d/b/a "THE FIRE STORE", and each of them, in an amount exceeding the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

Respectfully submitted,

_____

Mitchell W. Bild

Kenneth T. Lumb
William T. Gibbs
Mitchell W. Bild
Corboy & Demetrio, P.C.
Attorneys for Plaintiff
33 North Dearborn Street, 21st Floor
Chicago, Illinois 60602
(312) 346-3191; Primary E-mail:  ccfiling@corboydemetrio.com
ID No. 02329

FILED DATE: 11/25/2024 9:03 PM   2024L013304